# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KA-00372-SCT

*CLAYTON PAUL BATEMAN a/k/a*
*CLAYTON P. BATEMAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2012 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER N. AIKENS |
| | GEORGE T. HOLMES |
| | FRANCIS RYAN BROSSETTI |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEPHANIE B. WOOD |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/15/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Clayton Paul Bateman was convicted in the Harrison County Circuit Court of two counts of sexual battery and two counts of touching a child for lustful purposes.  He was sentenced to a total of thirty years' imprisonment.  Bateman now appeals his conviction. Finding no reversible error, we affirm Bateman's convictions and sentences.

## FACTS & PROCEDURAL HISTORY

¶2.     In 2009, Clayton Paul Bateman and Melissa Anglada lived together in a mobile home in Saucier, Mississippi, with their four children. Bateman and Anglada had dated for roughly a decade, but never married. Bateman was awarded custody of the couple's children in 2007, but the couple continued living together until the date Bateman was arrested. This case involves Bateman's two oldest daughters, "Rene" and "Bailey."[1]  In 2009, Rene was nine years old, and Bailey was eight years old.

¶3.     On March 16, 2009, Anglada called the Harrison County Sheriff's Department to report an allegation of sexual abuse of Rene by Bateman. Officer Bill Scarbrough responded to Anglada's parents' mobile home, where Anglada, Rene, and Bailey were located.  After hearing the allegations of abuse, Officer Scarbrough contacted Deborah Lacey, a social worker with the Harrison County Department of Human Services.  Lacey took Rene and Bailey to a Harrison County children's shelter.

¶4.     On March 18, 2009, forensic psychologist Dr. Donald Matherne performed an assessment of Rene and Bailey at the request of the Department of Human Services. Rene told Dr. Matherne that Bateman would sometimes touch her vaginal area with his fingers underneath her clothes.  He also would make her touch his "private area."  Bailey also stated that Bateman had touched her vaginal area with his fingers underneath her clothes.  Both girls told Dr. Matherne that Bateman had threatened them not to tell anyone about these touchings.

---

[1]To protect the identities of the minor victims, we will use the fictitious names "Rene" and "Bailey" when referring to Bateman's daughters.

¶5.    On March 19, 2009, Rene and Bailey were interviewed separately by Investigator Carolyn Prendergast, a criminal investigator for the Harrison County Sheriff's Department. Rene informed Investigator Prendergast that on March 16, Bateman had pulled her pants down and rubbed her "hiney" with his hand. (Rene and Bailey both refer to the female genitals as "hiney.") Rene stated that Bateman had done this on multiple occasions, though she couldn't remember the first time it happened.  In addition, Rene stated that Bateman would sometimes use his mouth and tongue to touch or lick her "hiney."  Bateman also made Rene touch his "private" on several occasions. (Rene and Bailey both refer to the male genitals as  "private" or "hiney.")

¶6.    Bailey told Investigator Prendergast that when she was younger, Bateman would touch her "hiney" with his hand and would sometimes put his hand inside her "hiney."  She could not remember any specific instances and initially stated that he had stopped this behavior when she was four years old. At first, Bailey informed Investigator Prendergast that she had never seen her father touch anyone else inappropriately, but she later stated that she once saw him touching Rene.

¶7.    On March 20, 2009, Rene and Bailey were examined by Dr. Daniel Overbeck, an emergency room doctor at the Garden Park Medical Center in Gulfport, Mississippi.  Dr. Overbeck conducted complete physical examinations of both girls. Bailey's exam was normal.  Rene's hymen was absent, and there was some redness and irritation around her clitoris.

¶8.    Bateman was arrested for the alleged sexual abuse of Rene and Bailey on March 18, 2009.  He was indicted by a grand jury in Harrison County on January 19, 2010.  Bateman

3

was charged with three counts of sexual battery and two counts of touching a child for lustful purposes. Specifically, Count I charged Bateman with sexual battery for "inserting his finger into the vagina" of Rene. Count II charged Bateman with sexual battery for "performing cunnilingus" upon Rene. Count III charged Bateman with touching a child for lustful purposes for "touch[ing] or rub[bing] with his hands the vagina" of Rene. Count IV charged Bateman with sexual battery for "inserting his finger into the vagina" of Bailey. Count V charged Bateman with touching a child for lustful purposes for "touch[ing] or rub[bing] with his hands the vagina" of Bailey. All these acts were alleged to have occurred on or between March 16, 2008, and March 16, 2009.

¶9. At trial, Rene testified that on March 16, 2009, she went into Bateman's room and "he pulled my pants down and he put his hand in my pants and he rubbed my hiney."[2] She could not remember if Bateman had touched her underneath her underwear on that particular day. Rene stated that her father would touch her with his hands, his mouth, and his penis. Rene was questioned about the details of her father's behavior and gave the following response:

Q: You said that he touched you with his hand. Where on your body would he touch you with his hand . . . ?
A: My private.
. . .
Q: When he would touch you with his hand . . . , would that be on top of your clothes or would his skin be touching your skin?
A: Both.
. . .
Q: . . . [T]he times when he would touch you with his hand and his skin would actually be touching your skin, did he keep his hand still or did he move it around any?
A: He moved it around.

_____

[2] By the date of the trial, Rene was twelve years old, and Bailey was eleven years old.

4

She also described how Bateman would use his mouth to touch her inappropriately.

> Q:  Okay. Well, let's talk about when he would touch you with his mouth. Where on your body . . . would he touch you?
> A:  My private.
> . . .
> Q:  . . . [W]as that on top of your clothes, or underneath?
> A:  Underneath my clothes.
> Q:  Was his skin touching your skin?
> A:  Yes.

Rene also testified that Bateman would make her touch his penis with her hands and mouth.

When questioned about the frequency of this abuse, Rene could not give a specific answer, but stated that Bateman had never gone more than a month or two without touching her inappropriately in some way.

¶10.  Bailey also testified that Bateman had touched her with his hands and mouth:

> Q:  Now, tell me, when your dad would touch you on your private place, what part of his body would touch you?
> A:  His hand or his mouth. Usually his hand, though.
> . . .
> Q:  Okay. When he would touch you with his hand . . . , was that on top of your clothes or was it underneath your clothes.
> A:  Both, but usually underneath.
> Q:  . . . [Was] his skin touching your skin?
> A:  Yes.
> Q:  And when he would touch you with his hand, would he keep his hand still, or did he do something with his hands, or nothing?
> A:  He moved it.
> . . .
> Q:  Okay. And . . . you said he would [sic] that your dad would touch you with his mouth too?
> A:  Yes.
> . . .
> Q:  Was that on top of your clothes or underneath?
> A:  Underneath.
> Q:  Was his skin touching your skin?
> A:  Yes.

She stated that she could remember only one occasion when he had touched her with his mouth. Bailey also could not remember when the abuse began, but said, "I wasn't that young when it stopped." Bailey said she could remember more at trial than when she talked to Investigator Prendergrast back in 2009, and she did not think Bateman had ever gone more than a year without touching her.

¶11. Prendergast recounted the details of her interviews with Rene and Bailey. The jury was allowed to hear the audiotapes of those interviews. In the interviews, both girls described the details of Bateman's alleged abuse, indicating on an age-appropriate anatomical diagram that they had been touched in their vaginal areas.

¶12. Dr. Overbeck recounted his examinations of Rene and Bailey from 2009. He informed the jury that Rene's hymen was absent and that there was some irritation on her vaginal area. Dr. Overbeck explained that, in his opinion, an eight-year-old girl's hymen could be broken only by some sort of penetration. On cross-examination, Dr. Overbeck indicated that it is possible, though very uncommon, for a female to lose her hymen by some way other than penetration, such as through a serious blunt-force trauma. Based on his examination, Dr. Overbeck concluded that his findings regarding Rene were consistent with a child who had been sexually abused. Dr. Overbeck also informed the jury that his examination of Bailey was normal. While it was not possible for Dr. Overbeck to determine whether Bailey had been touched inappropriately, he did conclude that she had not been penetrated.

¶13. In describing his examinations of Rene and Bailey to the jury, Dr. Matherne explained his utilization of the "fist demonstration" to determine what degree of penetration, if any, might have occurred. During his examinations, he asked the girls to make a fist with one

6

hand, representing the area that was touched, and to use the other hand to describe how they were touched. Dr. Matherne testified that Rene "took her hand, she touched the exterior and then she inserted, and she inserted it all the way in." Based on this demonstration, Dr. Matherne testified that Rene's interview was consistent with a child who had suffered sexual abuse. Referring to Bailey, Dr. Matherne stated, "When using the fist demonstration, the depth of penetration was very shallow, and it was apparent that there was no significant digital penetration on her part when she was conveying to me what happened." Nevertheless, Dr. Matherne expressed the opinion that Bailey's interview was consistent with a child who had "experienced an inappropriate act."

¶14. Bateman testified on his own behalf and denied the abuse. He presented no other evidence or witnesses. At the conclusion of the trial, the jury returned a verdict finding Bateman guilty of Counts I, II, III, and V. The jury found Bateman not guilty of Count IV, sexual battery against Bailey. Bateman was sentenced to thirty years each for Counts I and II, to run concurrently. He also was sentenced to fifteen years each for Counts III and V, to run consecutively to each other and concurrently with Counts I and II. Bateman was given credit for time served.

¶15. Following the trial court's denial of his post-trial motions, Bateman filed an appeal to this Court, raising the following issues:

I. **The trial court erred in granting Instruction S-10.**

II. **The evidence was insufficient to support the verdict on Count V; alternatively, the verdict on Count V was against the overwhelming weight of the evidence.**

7

**III.** The trial court erred in allowing Dr. Matherne to testify as to his "fist demonstration" methodology.

**IV.** Bateman's convictions on Counts II, III, and V violate his double jeopardy protection against subsequent prosecution for the same offense.

**V.** Bateman's constitutional right to a speedy trial was violated.

**VI.** Ineffective Assistance of Counsel

## DISCUSSION

### I. The trial court did not abuse its discretion in granting Instruction S-10.

¶16. Jury instructions are within the discretion of the trial court, so this Court must review the grant or denial of a jury instruction for an abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010) (internal citations omitted). When considering whether error lies in granting or refusing a jury instruction, the instructions actually given must be read as a whole and in context. *Ruffin v. State*, 992 So. 2d 1165, 1176 (Miss. 2008). No reversible error exists if the instructions fairly announce the law of the case and create no injustice. *Rubenstein v. State*, 941 So. 2d 735, 784-785 (Miss. 2006).

¶17. Bateman's argument on this issue addresses his conviction on Count II, sexual battery against Rene by cunnilingus. Bateman argues that the trial court erred in granting Instruction S-10 because it removed from the jury's province the factual issue of whether oral stimulation constitutes penetration. Instruction S-10 states:

> The Court instructs the jury that proof of contact, skin to skin, between a person's mouth, lips, or tongue and the genital opening of a woman's body, whether by kissing, licking, or sucking is sufficient proof of sexual penetration through the act of cunnilingus.

8

Bateman contends that Instruction S-10 authorized the jury to find him guilty of sexual battery without a finding of "sexual penetration."

¶18. "Sexual penetration is the essence of the offense of sexual battery." *West v. State*, 437 So. 2d 1212, 1213 (Miss 1983). Section 97-3-95(1)(d) of the Mississippi Code requires proof of "sexual penetration" for a person to be convicted of sexual battery. Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2006). "'Sexual penetration' includes *cunnilingus*, fellatio, . . . *any* penetration of the genital or anal openings of another person's body by *any* part of a person's body, and insertion of *any* object into the genital or anal openings of another person's body." Miss. Code Ann. § 97-3-97(a) (Rev. 2006) (emphasis added).

¶19. This Court has held that slight penetration to the vulva or labia is sufficient to constitute the offense of rape. *Jackson v. State*, 452 So. 2d 438, 440 (Miss. 1993). Sexual battery is no different. *Johnson v. State*, 626 So. 2d 631, 633 (Miss. 1993). In *Johnson*, this Court affirmed the trial court's use of a jury instruction defining "sexual penetration" as, among other things, "mouth to vagina contact commonly called cunnilingus." *Id.* This Court held that "proof of contact, skin to skin, between a person's mouth, lips, or tongue and the genital opening of a woman's body, whether by kissing, licking, or sucking, is sufficient proof of 'sexual penetration' through the act of 'cunnilingus' within the purview of § 97-3-97(a) . . . ." *Id.* at 633-634.

¶20. Instruction S-10 is taken verbatim from this Court's holding in *Johnson*. After reviewing the plain language of Section 97-3-97(a), along with this Court's holdings applying that statute, we find that Instruction S-10 is clearly a correct statement of law. Read in conjunction with the other instructions, Instruction S-10 merely informed the jury that if

9

it found beyond a reasonable doubt that cunnilingus had occurred between Bateman and his daughter, and that some penetration had occurred, however slight, the jury could find Bateman guilty of sexual battery on Count II. In addition, Instruction S-10 had an evidentiary basis. Rene testified that Bateman had touched her vaginal area with his mouth and tongue. This allegation was repeated to Dr. Overbeck, Dr. Matherne, and Prendergast. Accordingly, the trial judge correctly instructed the jury that this conduct could constitute sexual penetration under Mississippi law.

## II. The evidence was sufficient to support the verdict on Count V, and the verdict was not against the weight of the evidence.

¶21.    Count V charged Bateman with touching a child for lustful purposes by touching or rubbing Bailey's vagina with his hands. Bateman argues that the evidence presented at trial was insufficient to establish that this alleged touching occurred during the one-year period listed on the indictment. Rather, in Bateman's opinion, the weight of the evidence suggests that Bateman had not touched Bailey since she was four years old.

¶22.    In reviewing the sufficiency of the evidence, this Court will view all evidence in the light most favorable to the verdict. *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005). If any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, this Court will not disturb the verdict. *Id.* The State receives the benefit of all favorable inferences reasonably drawn from the evidence. *Hughes v. State*, 983 So. 2d 270, 275-276 (Miss. 2008).

¶23.    In reviewing a challenge to the weight of the evidence, this Court will overturn a verdict only "when it is so contrary to the overwhelming weight of the evidence that to allow

10

it to stand would sanction an unconscionable injustice." ***Bush***, 895 So. 2d at 844. The evidence is viewed in the light most favorable to the verdict. ***Id.*** If the verdict is against the overwhelming weight of the evidence, the proper remedy is to grant a new trial, but this remedy should be used only in exceptional cases where the evidence "preponderates heavily against the verdict." ***Id.*** The jury, as the trier of fact, is the sole judge of the weight of the evidence and the credibility of the witnesses. ***Valmain v. State***, 5 So. 3d 1079, 1086 (Miss. 2009) (citing ***Mohr v. State***, 584 So. 2d 426, 431 (Miss. 1991)). "Conflicting testimony does not evince overwhelming evidence; '[w]here the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict.'" ***Brown v. State***, 995 So. 2d 698, 702 (Miss. 2008) (quoting ***Nicholson v. State***, 523 So. 2d 68, 71 (Miss. 1988)).

¶24. Count V charged Bateman with touching a child for lustful purposes in violation of Section 97-5-23 of the Mississippi Code. That statute provides:

> [A]ny person above the age of eighteen (18) years, who, for the purposes of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body any member thereof, any child under the age of sixteen (16) years, with or without the child's consent . . . shall be guilty of a felony.

Miss. Code Ann. § 97-5-23(1) (Rev. 2006). Bateman does not argue that the evidence was insufficient to prove that he touched Bailey inappropriately. Rather, Bateman argues that the State failed to prove that this touching occurred during the time frame in the indictment. Bateman argues that Bailey contradicted her own testimony at trial with prior statements to other witnesses. During her 2009 interview with Prendergast, Bailey stated that Bateman had not touched her since she was four years old. At trial, Bailey testified that Bateman had

11

never gone a whole year without touching her inappropriately. A general denial was the only evidence offered by Bateman to contradict Bailey's statements at trial.

¶25. Reviewing the evidence in the light most favorable to the verdict, a reasonable jury could have found that Bateman did touch Bailey for lustful purposes during the time frame listed in the indictment. The exact date of this touching was not an essential element of the State's proof. This Court has held that a specific date is not required in a child-abuse case as long as the defendant is "fully and fairly advised of the charge against him." *Morris v. State*, 595 So. 2d 840, 842 (Miss. 1991) ("Traditionally, time and place have been viewed as not requiring considerable specificity because they ordinarily do not involve proof of an element of crime.")

¶26. It is well-settled that "the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence." *Miley v. State*, 935 So. 2d 998, 1001 (Miss. 2006). The State presented sufficient evidence, aside from Bailey's testimony, to prove that Bateman had touched Bailey for the purpose of gratifying his lustful desires. Dr. Matherne opined that Bailey's examination was consistent with a child who had suffered "an inappropriate act," and Bailey stated at trial that her father had never gone more than a year without touching her inappropriately. Dr. Matherne also opined that "the information she provided did indicate that it had occurred on more than one occasion and more recently than four years of age." Based on this information, a reasonable jury could have found each of the essential elements of the crime in Count V. Therefore, we find that the trial court did not err in denying Bateman's motion for judgment notwithstanding the verdict.

¶27. In addition, the verdict was not against the weight of the evidence. It was the jury's duty to weigh the credibility of Bailey's statements to Prendergast and her testimony at trial. *See **Nicholson***, 523 So. 2d at 71 (finding that the verdict was not against the weight of the evidence where victim gave conflicting statements regarding identity of defendant; it was the jury's duty to judge the credibility of the victim's statements). At trial, Bailey was three years older than she was when she first was interviewed about the abuse. She stated that she could remember more at trial than she did at the initial interview. Bailey's statements at trial were corroborated by Dr. Matherne's opinion that Bailey had suffered "an inappropriate act." If any conflict in the witnesses' statements arose, it was the jury's duty to resolve that conflict. *See **Valmain***, 5 So. 3d at 1086 (finding that verdict was not against the weight of the evidence where defendant denied sexually penetrating minor victim; conflicting testimony created an issue of fact for the jury to resolve). We find that the trial court did not err in denying Bateman's motion for a new trial, as the evidence does not preponderate so heavily against the verdict that allowing it to stand would constitute an unconscionable injustice.

### III. The trial court did not err in allowing Dr. Matherne's testimony regarding the "fist demonstration."

¶28. Bateman argues that Dr. Matherne's explanation of the "fist demonstration" does not meet the standard of admissibility for expert testimony. The admission of expert testimony is within the discretion of the trial court. **Bishop v. State**, 982 So. 2d 371, 380 (Miss. 2008). This Court will not reverse the trial court's decision to admit expert testimony unless the

decision was "arbitrary and clearly erroneous, amounting to an abuse of discretion." *Lima v. State*, 7 So. 3d 903, 907 (Miss. 2009).

¶29. The admissibility of expert testimony is governed by Rule 702 of the Mississippi Rules of Evidence. This rule allows a witness qualified as an expert to testify in the form of an opinion if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case." M.R.E. 702. This Court has adopted the United States Supreme Court's standard for judging the admissibility of expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and modified by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35-39 (Miss. 2003). Expert testimony must be relevant and reliable to be admissible. *McLemore*, 863 So. 2d at 38. Further, "[t]he trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue.'" *Id.* at 36 (quoting *Daubert*, 509 U.S. at 593).

¶30. Prior to trial, the trial court held a *Daubert* hearing regarding Dr. Matherne's qualifications and testimony. Dr. Matherne shared his educational background and his professional experience in the field of forensic psychology. Bateman's attorney cross-examined Dr. Matherne on his knowledge, skill, experience, training, and education, and did not object to the court's acceptance of Dr. Matherne as an expert in the field of forensic psychology. Dr. Matherne then testified regarding his examination of Rene and Bailey,

14

explaining the "fist demonstration" that he had used during his interviews with the girls. Dr. Matherne's "fist demonstration" was used to create a visual representation of the victims' verbal statements regarding the degree of penetration, if any, they suffered. Dr. Matherne stated this demonstration was used primarily to determine if further physical examination was necessary. Bateman's attorney had the opportunity to cross-examine Dr. Matherne thoroughly on his use of the "fist demonstration and also called a competing expert witness to challenge the reliability of Dr. Matherne's methods. At the end of the *Daubert* hearing, the court heard oral argument on Bateman's motion in limine to exclude the "fist demonstration" testimony. The court first noted that Dr. Matherne had been accepted as an expert in the field of forensic psychology. Next, the court found that Dr. Matherne's "fist demonstration" was relevant to the case. The court noted that Dr. Matherne's "fist demonstration" did not meet many of the *Daubert* factors, but found that this did not render the testimony automatically inadmissible. The trial court found that Dr. Matherne's "fist demonstration" testimony was reliable and allowed him to testify regarding the "fist demonstration" at trial.

¶31. In allowing Dr. Matherne to testify regarding the "fist demonstration," the trial court noted that he had been allowed to testify on this specific technique in *Davis v. State*, 878 So. 2d 1020 (Miss. Ct. App. 2004), and *Anderson v. State*, 62 So. 3d 927 (Miss. 2011). In these cases, the Court of Appeals and this Court, respectively, upheld the admission of Dr. Matherne's testimony regarding the "fist demonstration." In *Davis*, the Court of Appeals found that the "'fist technique' referred to by Dr. Matherne was only a form of information gathering[,]" rather than expert testimony. *Davis*, 878 So. 2d at 1024. In *Anderson*, this

15

Court held that Dr. Matherne's testimony simply illustrated a technique used to gather information from minor victims, adopting the reasoning stated in ***Davis***. ***Anderson***, 62 So. 3d at 938.

¶32. Bateman argues that Dr. Matherne's testimony met none of the principles for reliability set out in ***Daubert***.[3] However, this Court already has addressed this exact issue and found no error in the trial court's allowing Dr. Matherne's testimony, irrespective of total compliance with ***Daubert***. *See **Anderson***, 62 So. 3d at 939. This Court has held that failure to meet the ***Daubert*** principles does not automatically render an expert's testimony inadmissible. ***Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara***, 908 So. 2d 716, 723 (Miss. 2005). ***Daubert***'s list of factors is meant to be illustrative, but not exhaustive, and the factors' applicability depends on "the nature of the issue, the expert's particular expertise, and the subject of the testimony." ***McLemore***, 863 So. 3d at 37 (citing ***Kumho Tire***, 526 U.S. at 137). "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." ***Daubert***, 509 U.S. at 593. Bateman takes particular issue with the fact that Dr. Matherne's use of the "fist demonstration" has not been published or peer-reviewed. Yet, as the United States Supreme Court in ***Khumo Tire*** reasoned, "It might not be surprising in a particular case . . . that a claim made by a scientific witness has never been subject to peer review." ***Khumo Tire***, 526 U.S. at 151.

---

[3]The principles of reliability set out in ***Daubert*** are: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance in the relevant scientific community. ***Daubert***, 509 U.S. at 592-594.

¶33. Guided by the principles of ***Daubert*** and the language of Rule 702, the trial court allowed Dr. Matherne to testify regarding the "fist demonstration." Dr. Matherne had been accepted by the court, with no objection from Bateman, to give expert testimony in the field of forensic psychology. The trial court found that Dr. Matherne's "fist demonstration" testimony was reliable based on his extensive professional experience in the field of forensic psychology, that it was was clearly relevant to the issues before the court, and prior decisions of the Court of Appeals and this Court had found no reversible error in the admission of this testimony. The record clearly reflects that Dr. Matherne's "fist demonstration" testimony was based on his professional experience in the field of forensic psychology and would assist the trier of fact in understanding a fact at issue. *See* M.R.E. 702; ***Anderson***, 62 So. 3d at 937. Therefore, the trial court did not act arbitrarily or clearly erroneously in allowing Dr. Matherne to testify regarding the "fist demonstration."

### IV. Bateman's right to be protected against double jeopardy was not violated.

¶34. Bateman argues that his convictions on Counts II, III, and V violate his right to be protected against double jeopardy, because the evidence failed to establish distinguishable offenses on particular occasions for each count. Bateman does not argue that he was given multiple punishments for the same offense, nor that he already has been prosecuted for these offenses. Rather, Bateman contends he would be unable to claim double jeopardy in a subsequent prosecution for a similar offense during the same time frame.

¶35. We first note that Bateman never raised the issue of double jeopardy at trial. Nevertheless, "[A]s the protection against double jeopardy is a fundamental right, [this

17

Court] will not apply a procedural bar," and Bateman's claim can be raised for the first time on appeal. *Graves v. State*, 969 So. 2d 845, 846-847 (Miss. 2007) (citing *Fuselier v. State*, 654 So. 2d 519, 522 (Miss. 1995)). Claims of double-jeopardy violations are reviewed *de novo*. *Goforth v. State*, 70 So. 3d 174, 188 (Miss. 2011) (citing *Boyd v. State*, 977 So. 2d 329, 334 (Miss. 2008)).

¶36. The only case cited by Bateman in support of this argument is *Goforth v. State*, 70 So. 3d 174 (Miss. 2011), which he concedes is distinguishable from this case. In *Goforth*, this Court reversed the defendant's convictions for sexual battery because her constitutional right of confrontation was violated. *Id.* at 187. We rendered judgment on the defendant's behalf because we found that a retrial would violate her right to protection against double jeopardy. *Id.* at 190. The defendant's indictment contained five identically worded allegations of sexual battery. *Id.* Even though the jury found the defendant guilty of the first two counts and not guilty of the remaining three counts, this Court found no identifiable basis for their distinction among the counts. *Id.* at 189-190. On retrial, it would have been impossible to determine on which specific charges she had been convicted or acquitted. *Id.*

¶37. Bateman's reliance on *Goforth* is misguided. Unlike the defendant in *Goforth*, Bateman's indictment charged him with five distinct offenses, rather than multiple indistinguishable counts of the same offense. Bateman was convicted of two distinct counts of sexual battery and one distinct count of lustful touching against Rene. Bateman also was convicted of one distinct count of lustful touching against Bailey. Each of these crimes was alleged to have occurred during a specific time frame. As stated previously in this opinion, specific dates are not required in child sexual-abuse cases as long as the defendant is "fully

18

and fairly informed of the charges against him." ***Tapper v. State***, 47 So. 3d 95, 102 (Miss 2010) ("In our case today, it appears from the record and testimony, that the State could not narrow the time frame or provide more specific details than it did."). The State presented sufficient evidence to support each of these separate counts. It is clear that Bateman cannot be prosecuted subsequently for the same offenses against Rene or Bailey during this time frame. *See* ***Eakes v. State***, 665 So. 2d 852, 860 (Miss. 1995) (rejecting defendant's double-jeopardy claim, finding that he could claim double jeopardy if additional actions were brought charging him with sexually abusing the same victim in the same county on or about the same dates in the indictment). Therefore, Bateman's argument is without merit.

### V. Bateman's right to a speedy trial was not violated.

¶38. Bateman claims his constitutional right to a speedy trial was violated because roughly three hundred days passed between his arrest and the date he was indicted.

¶39. "The standard of review for a speedy trial claim focuses on the fact question of whether the trial delay arose from good cause." ***Flora v. State***, 925 So. 2d 797, 814 (Miss. 2006) (citing ***DeLoach v. State***, 722 So. 2d 512, 516 (Miss. 1998)). If substantial credible evidence supports a finding of good cause, this Court will not disturb that finding. ***Folk v. State***, 576 So. 2d 1243, 1247 (Miss. 1991). The sole remedy for a speedy-trial violation is reversal of the trial court's decision and dismissal of the charges against the defendant. ***Price v. State***, 898 So. 2d 641, 647 (Miss. 2005) (citing ***DeLoach v. State***, 722 So. 2d 512, 516 (Miss. 1998).

¶40. Criminal defendants are guaranteed the right to a speedy trial by the United States and Mississippi Constitutions. U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890). When

19

considering an alleged violation of a defendant's right to a speedy trial, this Court applies the four-part test developed by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). *See Adams v. State*, 583 So. 2d 165, 167 (Miss. 1991). The relevant factors to be considered are: (1) the length of delay; (2) the reason for delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant has been prejudiced by the delay. *See Barker*, 407 U.S. at 530-533. None of these factors is a necessary or sufficient condition to the finding of a violation of the right to a speedy trial; they must be considered together with other relevant circumstances. *Id.* at 533.

### A. Length of Delay

¶41. The right to a speedy trial attaches at the time of arrest, indictment, or information, when the defendant has been accused. *Flora*, 925 So. 2d at 815. This Court has held that a delay of eight months or more is presumptively prejudicial and requires a balancing of the remaining *Barker* factors. *See Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989) (internal citations omitted).

¶42. Bateman's right to a speedy trial attached on March 18, 2009, the day he was arrested for the alleged sexual abuse of Rene and Bailey. He made an initial appearance on that day and then appeared again on March 20, 2009.[4] He was indicted on January 19, 2010, some 308 days after his arrest. Bateman's trial began on February 16, 2012, some 1,065 days after he

---

[4] The chronology of events provided by Bateman to the trial court indicates that Bateman made a "2nd initial appearance" on March 20, 2009. The record is silent as to why he appeared in court on that day.

was arrested. Therefore, the delay in this case is presumptively prejudicial, and we must address the remaining *Barker* factors.

**B. Reason for Delay**

¶43. When the length of the delay is presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay. *Bailey v. State*, 78 So. 3d 308, 321 (Miss. 2012) (citing *Stevens v. State*, 808 So. 2d 908, 916 (Miss. 2002)). Different reasons for delay are assigned different weights. *Barker*, 407 U.S. at 532. A deliberate attempt to delay trial to inhibit the defense is weighed heavily against the State. *Id.* More neutral reasons, such as an overcrowded docket, should be weighed less heavily but nonetheless must be considered, since the responsibility for such circumstances rests with the government. *Id.* On the other hand, "A delay caused by the actions of the defendant . . . tolls the running of the time period for that length of time, and is subtracted from the total amount of the delay." *Taylor v. State*, 672 So. 2d 1246, 1259 (Miss. 1996).

¶44. Based on the chronology of events provided by Bateman to the trial court, the following is a timeline of the events relevant to Bateman's speedy-trial claim:

| | |
|---|---|
| March 18, 2009 | Bateman is arrested. |
| March 18, 2009 | Bateman makes initial appearance. |
| March 20, 2009 | Bateman makes second initial appearance. |
| January 19, 2010 | Bateman is indicted. |
| February 3, 2010 | Bateman makes formal demand for speedy trial. |
| February 8, 2010 | Court grants Bateman's demand for speedy trial. Trial is set for April 26, 2010. |
| March 23, 2010 | Court grants Bateman's motion to continue trial to September 7, 2010. |
| August 24, 2010 | Court grants Bateman's motion to continue trial to October 25, 2010. |
| October 6, 2010 | Court continues trial to February 7, 2011, on its own motion (no court reporter available). |

| February 3, 2011 | Court grants Bateman's motion to continue trial to May 2, 2011. |
| May 2, 2011 | Court grants Bateman's motion to continue trial to June 20, 2011. |
| June 15, 2011 | Court grants Bateman's motion to continue trial to August 22, 2011. |
| July 29, 2011 | Court grants Bateman's motion to continue trial to November 14, 2011. |
| November 14, 2011 | Court grants Bateman's motion to continue trial to February 6, 2011. |
| February 6, 2011 | Bateman's trial begins. |

¶45. Bateman was incarcerated for 308 days before he was indicted. By the time the trial actually began, though, Bateman's requests for continuances had created a 575-day delay. The prosecutor clearly indicated this to the trial court at a pretrial hearing on Bateman's motion to dismiss. The trial court found Bateman's speedy-trial argument to be disingenuous due to his seven requests for continuance.

¶46. Although Bateman's requests for continuance caused the most significant delay to Batmeman's trial date, this Court has held that well-taken motions for continuance may justify delay in a criminal trial. *Flora v. State*, 925 So. 2d 797, 815 (Miss. 2006). This period must be subtracted from the total period of the delay. *See Taylor*, 672 So. 2d at 1259. Therefore, the State is left with an unexplained 380-day delay in this case, representing the time between his arrest and his first motion for continuance. This period does not include the 120-day continuance ordered *sua sponte* by the trial court, which was justified and will not count against either side. We must weigh this factor in Bateman's favor.

**C. Defendant's timely assertion of his right to a speedy trial**

22

¶47. Bateman filed a demand for a speedy trial on February 3, 2010, two days after his arraignment, and 310 days after his arrest. Therefore, Bateman claims that this factor should weigh in his favor.

¶48. "Although it is the State's duty to ensure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right." *Taylor*, 672 So. 2d at 1261. "[F]ailure to assert this right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532. This Court has held that this factor weighs against a defendant who waits a significant amount of time after arrest to demand a speedy trial. *C.f.*, *Noe v. State*, 616 So. 2d 298, 301 (Miss. 1993) (holding that the defendant's failure to assert his right to a speedy trial until one year after his arrest weighed heavily against him under this *Barker* factor); *Wall v. State*, 718 So. 2d 1107, 1113 (Miss. 1998) (holding that defendant's assertion of his right to a speedy trial two months before his trial began did not satisfy this *Barker* factor).

¶49. This Court has held that a defendant's failure to demand a speedy trial between his arrest and indictment is "critical" to the analysis of a speedy-trial claim. *State v. Woodall*, 801 So. 2d 678, 684 (Miss. 2001). In *Woodall*, the defendant never made a demand for a speedy trial during the period between his arrest and his indictment, a period of 366 days. *Id.* at 684. The defendant argued that "there was no means by which [he] could have forced the speedy trial issue." *Id.* at 685. The State disagreed, asserting that it receives such demands regularly. *Id.* In reversing the dismissal of the claims against the defendant, this Court held that, while a defendant does not have to raise the speedy-trial issue to preserve it, he does have a duty, according to *Barker*, to assert that right. *Id. E.g.*, *Watts v. State*, 733

So. 2d So. 2d 214, 236 (Miss. 1999); ***Stogner v. State***, 627 So. 2d 815, 819 (Miss. 1993) (holding that a defendant's failure to assert the right to speedy trial must be weighed against him in ***Barker*** analysis). The defendant failed to do so in a timely manner and provided no proof of his inability to raise the issue. ***Id.*** Accordingly, this Court weighed this ***Barker*** factor against the defendant. ***Id.*** *See also* ***Young v. State***, 891 So. 2d 813, 818 (Miss. 2005) (This Court, relying on ***Woodall***, weighed this factor against a defendant who had made no request for an attorney or for a speedy trial during the 366 days between his arrest and indictment).

¶50. While Bateman did assert his right to a speedy trial two days after his arraignment, he already had been in State custody for approximately 310 days by that point. He certainly knew of the charges against him, as he already had made two initial appearances.[5] The record contains no evidence that Bateman requested bail, an attorney, or a speedy trial during the period between his arrest and his indictment. *See* ***Young v. State***, 891 So. 2d at 818. The trial court promptly responded to Bateman's request on February 8, 2010, setting his trial date for April 26, 2010. Bateman failed to assert his right to a speedy trial in a timely manner and offered no evidence of his inability to do so. *See* ***Woodall***, 801 So. 2d at 685. Accordingly, we must weigh this factor against Bateman.

### D. Prejudice to the defendant

---

[5]The record in this case contains no less than ten *pro se* filings by Bateman, even though he was represented by counsel. In July of 2011, he even filed his own motion to dismiss for lack of prosecution, which includes a complete speedy-trial analysis in light of ***Barker v. Wingo.***

24

¶51. The final prong of *Barker* encompasses two aspects: actual prejudice in defending the case and interference with the defendant's liberty. *Perry v. State*, 637 So. 2d 871, 876 (Miss. 1994). The three main considerations in determining whether the accused was prejudiced by a lengthy delay are: "(1) preventing 'oppressive pretrial incarceration'; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Brengettcy v. State*, 794 So. 2d 987, 994 (Miss. 2001) (quoting *Barker*, 407 U.S. 532).

## 1. Oppressive Pretrial Incarceration

¶52. The first interest to be considered is whether the delay caused oppressive pretrial incarceration. As noted above, Bateman was incarcerated for roughly ten months before he was indicted. However, incarceration alone is not a sufficient showing of prejudice to warrant reversal. *Taylor*, 672 So. 2d at 1261. "[A] defendant's assertion of prejudice attributable solely to incarceration, with no other harm, typically is not sufficient to warrant reversal." *Jenkins v. State*, 947 So. 2d 270, 277 (Miss. 2006) (citing *Ross v. State*, 605 So. 2d 17, 23 (Miss. 1992)). In *Magnusen v. State*, 646 So. 2d 1275, 1285 (Miss. 1994), we held that the defendant's pretrial incarceration was not oppressive where there was no evidence that his "employment or family life was disrupted or his financial resources drained or his associations curtailed[.]" Bateman's only claim is that the length of his incarceration is presumptively prejudicial under the first *Barker* factor. As this Court has held, this bare assertion is not enough. Bateman failed to "demonstrate how his pretrial incarceration has been oppressive." *See Hersick v. State*, 904 So. 2d 116, 124 (Miss. 2004). This interest does not weigh in Bateman's favor.

25

## 2. Anxiety or Concern to the Defendant

¶53.    The second interest to be considered is whether the delay caused anxiety or concern to the defendant.  "An analysis of the second interest . . . is related to the considerations discussed under the third ***Barker*** factor, the defendant's assertion of the right." ***Hersick***, 904 So. 2d at 124.  Bateman's only claim here is that a defendant is presumed to have suffered some anxiety during incarceration.  Even when the defendant does not assert any specific anxiety, this Court has presumed that some anxiety is "inevitably present."  ***Jaco v. State,*** 574 So. 2d 625, 632 (Miss. 1995) (citing ***Barker***, 407 U.S. at 537 (White, J., concurring)).

¶54.    Bateman offered no evidence to the trial court or to this Court that he suffered from any legitimate anxiety or concern during his incarceration.  Even assuming some anxiety as a natural consequence of incarceration, Bateman's own actions contributed to much of the delay in this case.  Bateman waited until 310 days after his arrest to assert his right to a speedy trial. Once a trial date was set, Bateman's seven requests for continuance contributed to a major delay in his trial. Therefore, we cannot weigh this interest in Bateman's favor.

## 3. Impairment of the Defense

¶55.    The third and most serious interest to be considered is whether the delay impaired the defense.  *See **Barker***, 407 U.S. at 532 ("Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."). Bateman argues only that his defense was inherently prejudiced to some extent by the fact that he was incarcerated.  *See **id.*** at 533 ("[I]f a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.") This Court generally will find prejudice where "there was a loss of evidence, the death of a

witness, or the investigation became stale." ***Magnusen***, 646 So. 2d at 1285. On the other hand, "'Delay is not an uncommon defense tactic' because '[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade.'" ***Guice v. State***, 952 So. 2d 129, 145 (Miss. 2007) (quoting ***Barker***, 407 U.S. at 521). If these witnesses support the prosecution, its case will be weakened. ***Id.*** *See also* ***U.S. v. Loud Hawk***, 474 U.S. 302, 315, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986) ("[D]elay is a double-edged sword . . . . The passage of time may make it difficult or impossible for the Government to carry [its] burden.").

¶56. The State pointed out that it never requested a continuance or took any action to delay the trial once the first trial date was set. In fact, the State indicated to the trial court that its case file was marked "ready for trial" on April 26, 2010, the original trial date, and no additional investigation was performed after that date. The State also argued that it intended to call the same witnesses that it indicated on its initial witness list. According to the State, Bateman did not submit a witness list until some time in November 2011, shortly before the hearing on his motion to dismiss. During the pretrial hearing on Bateman's speedy-trial claim, Bateman's argument focused solely on the length of the delay.

¶57. We find that the State provided sufficient evidence that Bateman's defense was in no way hindered by the delay. General denial was Bateman's only defense; he offered no alibi that could be corroborated through other witnesses. In fact, he offered no witnesses at all. He offered no proof that any evidence had been lost. In addition, the majority of the delay in this case was requested by Bateman to allow him to prepare his case. In sum, Bateman

27

failed to demonstrate that the delay in this case resulted in his inability adequately to prepare his case. *See **Barker***, 407 U.S. at 532.

¶58. After reviewing the three interests implicated by the fourth ***Barker*** prong, we find that the delay between Bateman's arrest and his trial did not result in any prejudice to Bateman. Aside from some level of presumed anxiety, there is no evidence in the record that Bateman's incarceration was oppressive or that it impaired his defense.

### E. Balancing Test

¶59. After reviewing all of the factors relevant to the analysis of a speedy-trial claim, we must balance each factor along with other relevant circumstances. *See **Barker***, 407 U.S. at 533. ("[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process."). We find that, while the first two ***Barker*** factors may weigh in Bateman's favor, the remaining ***Barker*** factors do not. Bateman's own requests for continuances delayed his trial date for almost three years, while the State was prepared to proceed at the initial trial date. Bateman neglected to assert his right to a speedy trial until almost a year after his arrest, and the trial court promptly met his request. Finally, the delay of Bateman's trial did not result in any prejudice to Bateman's defense, as there is no evidence of lost evidence, fading memories, or unavailable witnesses that would aid Bateman's general denial. After considering the ***Barker*** factors along with all other relevant circumstances, we find that Bateman's right to a speedy trial was not violated.

### VI. Ineffective Assistance of Counsel

¶60. Bateman has expressed the belief that he received ineffective assistance of counsel.

Generally, ineffective assistance claims are more appropriately brought during post-conviction proceedings. *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008). However, such a claim may also be raised on direct appeal "if such issues are based on facts *fully apparent from the record*." Miss. R. App. P. 22(b) (emphasis added). If the defendant's appellate counsel did not represent the defendant at trial, failure to raise such issues on direct appeal will bar consideration of the issue in post-conviction proceedings. *Id.* Bateman's appellate counsel, who did not represent Bateman at trial, makes no specific claims of ineffective assistance, but merely asks this Court to acknowledge the assertion of the claim. Bateman therefore has preserved the right to raise this issue in future post-conviction-relief proceedings.

**CONCLUSION**

¶61.    For the foregoing reasons, we affirm Bateman's convictions and sentences on Counts I, II, III, and V.

¶62.    **COUNT I: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  COUNT II: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  COUNT III: CONVICTION OF TOUCHING OF A CHILD FOR LUSTFUL PURPOSES AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT V: CONVICTION OF TOUCHING OF A CHILD FOR LUSTFUL PURPOSES AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  SENTENCE OF FIFTEEN (15) YEARS IN COUNT III TO RUN CONSECUTIVELY WITH THE FIFTEEN (15) YEARS IN COUNT V FOR A TOTAL OF THIRTY (30) YEARS; SENTENCE OF THIRTY (30) YEARS IN COUNT I TO RUN CONCURRENTLY WITH THE THIRTY (30) YEARS IN COUNT II, FOR A TOTAL OF THIRTY (30) YEARS TO RUN CONCURRENTLY WITH COUNTS III AND V FOR A TOTAL OF THIRTY (30) YEARS DAY FOR DAY UNDER SECTION 47-7-3.  APPELLANT SHALL**

**REGISTER AS A SEX OFFENDER UNDER SECTION 45-3-27. APPELLANT SHALL BE GIVEN CREDIT FOR ANY AND ALL TIME SERVED AS TO THIS CHARGE.**

**RANDOLPH, P.J., LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CHANDLER, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.**

**CHANDLER, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶63. I respectfully concur in part and in the result. In *Anderson v. State*, 62 So. 3d 927 (Miss. 2011), I wrote separately to express my opinion that Dr. Matherne's fist-demonstration methodology does not meet the modified *Daubert* standard for admissibility of expert testimony under Rule 702 of the Mississippi Rules of Evidence. *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (Miss. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). As in *Anderson*, I believe the trial court abused its discretion by finding the fist demonstration methodology was reliable and admissible. But, because the admission of the fist-demonstration testimony was harmless in light of the overwhelming evidence of Bateman's guilt of sexual battery, I concur with the majority's decision to affirm Bateman's convictions.

¶64. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

30

M.R.E. 702. This Court has adopted the modified *Daubert* standard for admissibility of expert testimony. *McLemore*, 863 So. 2d at 39. Before admitting expert testimony, the trial court, acting as "gatekeeper," must find that the expert testimony is both relevant and reliable. *Id.* at 38. The reliability analysis focuses on the principles and methodology underlying the expert opinion, not on the conclusions generated. *Id.* at 37.

¶65.    *Daubert* provided a list of illustrative, but not exhaustive, factors that may be considered to assess the reliability of proffered expert testimony. *McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 592-94, 113 S. Ct. 2786). These factors are:

> whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 592-94, 113 S. Ct. 2786). The applicability of these factors in a particular case "depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *McLemore*, 863 So. 2d at 37 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 237, 151, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). The trial court should consider the *Daubert* factors "where they are reasonable measures of the reliability of expert testimony." *McLemore*, 863 So. 2d at 37 (quoting *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. 1167).

¶66.    At the *Daubert* hearing, Dr. Matherne, a clinical psychologist, testified that he conducts forensic interviews of alleged child sex-abuse victims for the purpose of assisting the Department of Human Services in investigating abuse allegations. Dr. Matherne testified

31

that he has been in practice for more than forty years and he investigates about seventy-five allegations of child sex abuse per year. Dr. Matherne testified that he personally developed the fist-demonstration methodology and incorporated it into his interviewing technique. He testified that the fist demonstration allows the child to replicate the event in terms of whether there was any degree of penetration; this information is used to determine whether a physical examination is necessary. Dr. Matherne testified that the fist demonstration is an "information-gathering technique" that is "extremely effective." He admitted that the technique has not been subjected to peer-review or publication, and because it is not a test, there is no known rate of error. However, Dr. Matherne testified that, in his personal observation, the medical examination tended to validate the information the child provided in the fist demonstration. The defense called another psychologist, Dr. Beverly Smallwood, who testified that she had never heard of the fist-demonstration methodology and had been unable to find any publication that addressed it.

¶67. Relying on *Anderson*, the trial court found that the technique was reliable and admissible. At the trial, Dr. Matherne testified that the fist demonstration is the "most advantageous way" of getting a child to demonstrate what she remembers happened. He testified that, during Rene's fist demonstration, she had inserted her finger all the way into her closed fist. Dr. Matherne testified that "she was disclosing that there was penetration and that the penetration was deep." Bateman argues that the fist-demonstration evidence was unreliable, and that it was the only evidence of penetration that supported his conviction of sexual battery of Rene.

¶68. The majority finds that Dr. Matherne's testimony was reliable, despite its failure to meet the ***Daubert*** factors, stating that "failure to meet the ***Daubert*** principles does not automatically render an expert's testimony inadmissible." Maj. Op. ¶32. But analysis of this issue should not end there. "[W]hether testimony is based on professional studies or personal experience, the 'gatekeeper' must be certain that the expert exercises the same level of 'intellectual rigor that characterizes the practice of an expert in the relevant field.'" ***McLemore***, 863 So. 2d at 37-38 (quoting ***Kumho Tire***, 526 U.S. at 152, 119 S. Ct. 1167). "[N]either ***Daubert*** nor the Federal Rules of Evidence requires that a court 'admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert,' as self-proclaimed accuracy by an expert [is] an insufficient measure of reliability." ***McLemore***, 863 So. 2d at 37 (quoting ***Kumho Tire***, 526 U.S. at 157, 119 S. Ct. 1167).

¶69. The majority casts reliability concerns aside by finding that the fist demonstration is "only a form of information gathering." But most scientific testing is a form of information-gathering. A forensic interviewer gathers information from an alleged child sex-abuse victim through the use of techniques designed to minimize the danger of misreporting. *See*, *e.g.*, ***Mooneyham v. State***, 915 So. 2d 1102, 1107 (Miss. 2005) (Chandler, J., specially concurring). Therefore, the fact that the fist-demonstration methodology is a form of information gathering does not remove it from the strictures of ***Daubert***. While forensic interviewing techniques are not subject to testing and determining a rate of error, other ***Daubert*** factors are helpful in determining the reliability of such a technique. These are (1) whether the technique has been subjected to peer review and publication, (2) whether there

33

are standards controlling the technique's operation, and (3) whether the technique enjoys general acceptance in the relevant scientific community.

¶70.    Our courts have established that forensic interviewing is a field that is controlled by generally accepted standards. *Young v. State*, 106 So. 3d 811, 818 (Miss. Ct. App. 2011); *Carter v. State*, 996 So. 2d 112, 117 (Miss. Ct. App. 2008); *Williams v. State*, 970 So. 2d 727, 735 (Miss. Ct. App. 2007); *Lattimer v. State*, 952 So. 2d 206, 221 (Miss. Ct. App. 2006). But the fist demonstration exists outside of these standards – it is purely a creation of Dr. Matherne's that has not been subjected to peer review and publication, does not enjoy general acceptance in the psychology community, and is not subject to any standards controlling its operation, save those known only to Dr. Matherne. "[S]elf-proclaimed accuracy by an expert [is] an insufficient measure of reliability." *McLemore*, 863 So. 2d at 37 (quoting *Kumho Tire*, 526 U.S. at 157, 119 S. Ct. 1167). Nothing before the trial court showed that Dr. Matherne's fist-demonstration testimony exhibited the 'intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McLemore*, 863 So. 2d at 37-38 (quoting *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. 1167).

¶71.    I would find that Dr. Matherne's fist-demonstration testimony was unreliable and that its admission was error. However, because other evidence established Bateman's penetration of Rene, I would find that the error was harmless beyond a reasonable doubt. For these reasons and the reasons stated in my separate opinion in *Anderson*, I respectfully concur in part and in the result.

**DICKINSON, P.J., JOINS THIS OPINION**.

34