# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00524-COA

**SHAMELL HILL A/K/A SHAMELL ANTWANTE HILL A/K/A SHAMELL A. HILL**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/21/2022 |
| TRIAL JUDGE: | HON. ROBERT THOMAS BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JUSTIN T. COOK |
| | SHAMELL HILL (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/06/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A man was convicted of capital murder for stabbing his wife after breaking into her home.  Finding no error on appeal, we affirm.

## FACTS

¶2.     Shamell Hill and Lashawnda Wooten married in 2013.  Before marrying Shamell, Lashawnda had three children, and Shamell had at least two children of his own.  The two lived together for almost four years until their relationship became tumultuous.

¶3.     Shamell alleged he "started getting early signs of her having an affair."  He recalled

two particular instances in their marriage. First, he stated he received a voicemail from Lashawnda in which he heard her with another man. Second, he recalled going through his wife's phone and finding messages between her and another man. The couple separated, and Lashawnda moved into another home. According to Hill, the couple was separated for "a year and a half." But Shamell did not want the separation from his wife. Shamell called Lashawnda and expressed he loved her and was "ready to come home." But Lashawnda was unyielding. She denied his advances, stating she needed "a little space" and asked for time to herself.

¶4. The next night, Hill said he went to the casino with his friend. He stated after they left, he told his friend, "Take me home, man." Resistant to this idea, his friend replied, "Bro, I'm not taking you home." But Hill steadily insisted that his friend take him to his wife. So, the friend drove him to Lashawnda's home. Once he made it there, Hill went to the door and rang the doorbell. He looked inside the window and noticed that the children were home alone. He then walked away from the front door and saw Lashawnda driving "around the bend" with a man in the car. Hill got into his friend's car, and they followed Lashawnda. She did not drive straight home, though. She instead turned left and "got away."

¶5. Hill then called her and accused her of cheating. He told his wife, "You told me you wasn't fooling with nobody. You just said that you wouldn't cheat." She responded, "I told you I wanted a divorce." This angered Shamell. He then told his friend to go back to his wife's house. Once they made it back to her house, he noticed the man was no longer in the car. He then got out of his friend's car and "threw [his] phone at Lashawnda's car." After

2

his wife kept driving, he then "threw a stick" at her car. His wife then got out of her car and told Shamell, "[D]on't put your hands on me." Hill told his wife, "Shawnda, you shouldn't have did me like that." He stated he "grabbed her" and "slammed her on the ground." His wife was later taken to the hospital as a result of the injuries she sustained during the assault.

¶6. The next night, Shamell went to a local club with three of his friends. He stated he felt like "something wasn't right." He looked around and saw Lashawnda's brother walk into the club. He said he knew it was "fixing to go down." Hill, Lashawnda's brother, and one of the brother's friends began fighting. During the fight, Lashawnda's brother allegedly hit Shamell with a pool stick. Then, he claimed his brother-in-law "shot at [him]," hitting him "on [his] right elbow."

¶7. On December 27, 2018, Lashawnda got an emergency protective order against Hill. And on January 7, 2019, Hill was summoned to county court for a hearing on the protective order. After the hearing, a permanent protective order was entered. The order enjoined Hill from "abusing, harassing, stalking, following or threatening" Lashawnda. It further enjoined him from having "any contact with his wife either in person, by phone, electronic communication, or through a third party" except the court. Hill was further enjoined from "going within 100 yards" of his wife. The order was to remain in effect until one year later on January 7, 2020. Both Hill and his wife consented to the order.

¶8. Also at the hearing, Lashawnda stated she would be filing for divorce. A few days later on January 9 and January 10, respectively, Lashawnda and Hill separately met with an attorney and signed a joint complaint for divorce.

3

¶9.    Nine days later, on January 19, 2019, Hill stated his "heart was aching," so he called Lashawnda "several times." He said he "knew the restraining order was on there," but he "wanted to save [his] marriage." He stated that when they finally talked, he asked her if "she care[d] about the dude." She told him that she did. He then asked Lashawnda if she loved him. Hill stated she told him, "Yeah, Shamell, I do." Hill described his wife's response as "the sword that broke the camel's back."

¶10.    After hanging up with his wife, Hill made a series of phone calls. First, he called his sister. He stated his sister knew something was wrong, but he told her that "everything [was] fine." Next, he called his sons and talked to them. He also called two of his friends, but neither of them answered. After not getting in contact with his two friends, he talked to his brother and told him that he loved him. Lastly, he talked to his mother. She asked him several times if something was wrong. He told his mother that nothing was wrong with him and said, "I want to be by myself." He stated he told his mother he loved her. Afterward, Hill said he "laid back on [his] bed" and began "crying" and "praying." He stated he began thinking about the "betrayal" and his brother-in-law's "attempt to take [his] life."

¶11.    Hill then "got up, went to the kitchen, and . . . got the knife." He then went back into his room and "got a stick." He stated, "I just took off walking. I just walked. I just walked. I just walked."

¶12.    After walking a total of five miles, Hill made it near Lashawnda's house. He saw Lashawnda's cousin "pulling out" of the driveway. After realizing that she recognized him, Hill stated he "just took off running." He then walked to Lashawnda's home. He looked

4

inside the window and saw his wife in the kitchen. He then "busted the window" and went through it. He began charging through the house to the bedroom hoping that another man was there. However, he saw Lashawnda in the bathroom with the phone to her ear. He stated that she "just screamed" and shut the door.

¶13. He then "hit the door with [his] shoulder" and "went in." He told his wife, "I told you you ain't gonna hurt me." He then said, "You played me for the last time." He told his wife "Till death do us part, baby. That was our vows." He began stabbing her, and she fell back into the bathtub.

¶14. As Hill attacked his wife, her oldest daughter came into the bathroom and screamed, "Daddy, get off my mama." He told her to get her sister and get out of the house. But Lashawnda fought back. She told her daughter to "go grab the mace." Her daughter came back into the bathroom and sprayed the mace, missing Hill's face. Hill continued attacking Lashawnda. He stated he "plunged the knife in her chest" and then stabbed her in the neck. In total, Hill stabbed Lashawnda eighteen times.

¶15. Afterward, Hill got out of the tub and attempted to cut himself. He stated, "I took the knife to my neck two times." He stated he then "took the knife and started hitting [himself] in the stomach." Lashawnda's other daughter then came into the bathroom and asked, "Where mama?" He told her he was sorry and "ran out the back door" and into the woods. After running into the woods, he cut himself again. But this time, Shamell cut himself across his wrists.

¶16. He then ran back across the street near Lashawnda's house. He stated he came out

5

of the woods "with [his] hands up" and told the officer, "I'm the man you looking for." He was arrested and brought in for an interview with the detectives. Hill gave a video confession recalling all the events that took place. In his interview with detectives, he admitted he left his home with the intention of killing his wife.

¶17. Hill was indicted in Lauderdale County for capital murder in the commission of a burglary and charged as a habitual offender.

### PROCEDURAL HISTORY

¶18. At trial, the jury first heard from Lashawnda's father, Charles Wooten. He stated he talked to his daughter every night, and the night of the attack was no different. He told the jury that "no more than 20 minutes" into their conversation, he "heard a loud [noise] like an explosion." Her father believed this was the moment Hill "busted into the door." He said he knew Lashawnda was running. Mr. Wooten stated, "She called for me to help her, but I couldn't." He testified he heard Hill say, "I told you I was going to get you." Lashawnda's father stated at that point he was "en route to her destination" and dialed 911.

¶19. Next, Lashawnda's son testified. He stated he and his mother were in the kitchen when they "heard a lot of noise at the door." He said he thought it was a gunshot at first. He testified after hearing it again, Lashawnda "started crying" and "told [him] to run." He told the jury his mother screamed, "Dad, daddy, help me. He's here," and she ran into the bathroom. At that point he stated he heard Hill say, "I told you I was going to get you. I told you, didn't I."

¶20. The jury also heard from Lashawnda's oldest daughter. She told the jury that on the

6

night of the attack, she "heard a loud sound at the back door" of the house. She stated she thought the noise was a gunshot. She then "ran in the room with [her] sister to check on her" and noticed her mother in the bathroom. Lashawnda's daughter said she "stayed in [her] room for a few minutes" until her mother called her into the bathroom. She testified her mother yelled to her, "[G]rab the mace." She said she grabbed it and sprayed Hill, but his face was "turned the other way." She told the jury that at the time she sprayed the mace at Shamell, "he was on top of [her] mother in the bathtub." She then testified that her brother and sister were also in the house during the attack. She stated she "ran across the street to try to get the police officer that [lived] in front of [their house]."

¶21. Lastly, Hill took the stand in his own defense. He alleged his wife cheated on him several times before and after their marriage. He recalled "hitting" and "slamming" his wife onto the ground after seeing her with another man during their separation.

¶22. Hill then admitted calling Lashawnda despite the court order enjoining him from just such contact. He testified he called and asked Lashawnda if she loved the other man, and she replied that she did. Shamell said he got up and "got the knife." He stated the knife shown at trial was "not the knife [he] used" but ultimately testified he did grab a knife.

¶23. Hill also testified, contrary to the statement he gave during his interview, that he did not leave his house with the intention of killing his wife. He told the jury, "I didn't try to go to her house and take her life[.] I told you. I was in the wrong . . . state of mind, man." When asked why he grabbed the knife, he responded, "The knife was really for myself, to be honest with you." He also testified the stick was for his protection. He further told the

7

jury that after making several calls to people before the attack, he "didn't know" he was going to kill her. He stated, "I was not myself[.]"

¶24. During his testimony, Shamell argued that the photographs of the knife and the stick were wrong. Specifically, he testified, "[A]ll this stuff that's been showed here has been trumped up and altered and everything, man, just so y'all can . . . try to get a severe . . . sentence on me."

¶25. At the end of trial, Hill proposed a jury instruction for the lesser included offense of heat-of-passion manslaughter. He argued there was testimony that the knife was not grabbed for the purpose of seeing his wife but, instead, for the purpose of protecting himself because there had been threats from her family members. The State argued that it was "not required to prove malice to obtain a conviction of capital murder[.]" Furthermore, the State argued, "When a defendant arms himself prior to an encounter with the victim and in preparation for an encounter of the victim, that the heat of passion defense would not be supported[.]"

¶26. The trial court refused the instruction, stating that "there is no evidence in this case that would trigger some heat of passion." The trial court further stated, "There was a substantial cooling off period that existed between the provocation and the killing."

¶27. Hill was found guilty of capital murder and sentenced to serve life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections.

## DISCUSSION

I.   **The trial court properly refused Hill's lesser-included-offense jury instruction.**

¶28. Hill argues the trial court erred in refusing his lesser-included-offense instruction of

heat-of-passion manslaughter.

¶29.     "The standard of review for a claim that a defendant was entitled to a lesser-included-offense instruction is de novo, as this is a question of law." *Pierce v. State*, 107 So. 3d 1011, 1014 (¶11) (Miss. Ct. App. 2012).

¶30.     "To be entitled to a lesser-included-offense instruction, a defendant must point to some evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013). As with all instructions, "[a] lesser-offense instruction can be refused if it is without foundation in the evidence." *McCune v. State,* 989 So. 2d 310, 319 (¶17) (Miss. 2008).

¶31.     Hill was charged with capital murder pursuant to Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2020). Under this statute, "the killing of a human being without authority of the law shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of rape, *burglary*, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or any attempt to commit such felonies." (Emphasis added).

¶32.     In contrast, heat-of-passion manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense[.]" Miss. Code Ann. § 97-3-35 (Rev. 2020).

¶33.    Furthermore, our caselaw has defined heat of passion as

> [a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from a grade of murder to that of manslaughter.  Passion or anger suddenly aroused at the time by some **immediate and reasonable provocation**, by words or acts of one at the time.  The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Maye v. State*, 350 So. 3d 263, 268 (¶15) (Miss. Ct. App. 2022) (emphasis added).  "To reduce a homicide from murder to manslaughter, the impassioned reaction of the accused must have been reasonable: the passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Id*. at (¶16).  "[T]here must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Id*.  "[S]uch an instruction should not be indiscriminately or automatically given." *Id*.  "Moreover, a heat-of-passion jury instruction is not warranted where a cooling-off period exists between the provocation and the killing." *Id*.  "[T]he provocation must be *immediate*—that is, occurring at the time of the killing." *Alford v. State*, 5 So. 3d 1138, 1143 (¶17) (Miss. Ct. App. 2008) (emphasis added).

¶34.    Hill contends sufficient evidence showed that he was experiencing an "emotional state of mind characterized by anger, rage, hatred, and furious resentment."

¶35.    But there was a substantial cooling-off period in this case.  Hill testified the "sword that broke the camel's back" was Lashawnda's statement that she loved another man.  However, the jury heard Hill testify he took several actions after talking to his wife.  First,

10

Hill testified he called several people. He called his sister, his two sons, two of his friends, his brother, and lastly his mother. Second, Hill testified he "laid back in bed" and "cried and prayed." Then, he grabbed both a stick and a knife out of his house. Critically, Hill admitted he then walked five miles to Lashawnda's home. And during his interview with detectives, he confessed he left home with the intention of killing his wife.

¶36. Again, precedent requires the provocation to be "immediate and reasonable." There was ample evidence, including from the defendant himself, that a substantial cooling-off period existed between his conversation with Lashawnda and the fatal attack. Because this provocation, if any, was not immediate, the lesser-included-offense instruction of heat-of-passion manslaughter was without foundation and properly refused.

¶37. Hill also contends the testimony that he was armed in anticipation of needing to defend himself separates him from the underlying felony—burglary with the intent to assault someone. However, the jury heard Hill's confession that he left home with the intention of killing his wife. The jury also heard Hill confess to using his stick to "break the window" of Lashawnda's home. While Hill now argues that he did not leave home with the intention of killing his wife and that the stick was used for his protection, this directly contradicts his filmed confession. It is well settled that "when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Thompson v. State*, 338 So. 3d 730, 736 (¶32) (Miss. Ct. App. 2022). The jury heard this split in testimony and found his taped confession more credible.

¶38. Furthermore, evidence that he broke into Lashawnda's home with the intent to kill her

11

is not required. Hill was charged with capital murder. To be found guilty of capital murder, Mississippi Code Annotated section 97-3-19(2)(e) requires only that a killing took place while the accused was engaged in the commission of a felony, such as the one here—burglary. Therefore, Hill's argument is without merit.

¶39. "When viewing the evidence in the light most favorable to [Hill], no reasonable jury could find him not guilty of capital murder and yet guilty of heat-of-passion manslaughter." *Maye*, 350 So. 3d at 269 (¶20). Therefore, the judge did not err in refusing Hill's lesser-included-offense instruction.

## II. Hill's indictment was not defective.

¶40. Next, Hill argues his indictment was defective. He first argues his indictment was defective because it failed to state the judicial district of the county in which his indictment was brought. Second, he argues his indictment was defective because it failed to give a sufficient description of the crime charged because it did not state the word "did" before the words "kill and murder." Third, he argues his indictment was defective because it did not state the cause and manner of the victim's death.

¶41. "Whether an indictment is fatally defective is a question of law, which this [C]ourt reviews de novo." *Spearman v. State*, 80 So. 3d 116, 119 (¶12) (Miss. Ct. App. 2011). "An indictment must contain (1) the essential elements of the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Id.* "[S]o long as from a fair reading of the indictment, taken as a whole, the nature

12

and cause of the charge against the accused are clear, the indictment is legally sufficient." *Davis v. State*, 171 So. 3d 537, 540 (¶11) (Miss. Ct. App. 2015).

¶42. Hill argues his indictment failed to state the judicial district of the county that his indictment was brought. He contends the Mississippi Rules of Criminal Procedure "require[] the indictment to state whether it is brought in the first and second district."

¶43. An indictment should include "the county and, in two-district counties, the judicial district in which the indictment is brought." MRCrP 14.1(a)(2)(D). Because Lauderdale County is not a two-district county, no further action was required. Therefore, Hill's argument is without merit.

¶44. He next argues his indictment was defective because it failed to give a description of the crime committed. Specifically, he contends it failed to state the word "did" before the words "kill and murder." However, the indictment in fact states Hill "did unlawfully, wilfully, and feloniously, with or without the design to effect death, kill and murder Lashawnda Wooten." Therefore, this claim is without merit.

¶45. Finally, he argues his indictment was defective because it failed to include the victim's cause of death.

¶46. But Mississippi Code Annotated section 99-7-37(1) (Rev. 2020) states, "In an indictment for homicide it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused, but it shall be sufficient to charge in an indictment for murder, that the defendant did feloniously, willfully, and of his malice aforethought, kill and murder the deceased." Because Hill was indicted for capital murder,

language regarding the manner or cause of death was not required. Therefore, this issue is without merit.

### III. Hill's indictment was not constructively amended.

¶47. Hill argues his indictment was constructively amended because the State presented evidence of a murder weapon, though his indictment never charged such a weapon.

¶48. Because Hill's claim that the "indictment was improperly amended is a question of law . . . we review [the issue] de novo." *Roberson v. State*, 287 So. 3d 219, 230 (¶25) (Miss. Ct. App. 2017).

¶49. Our caselaw instructs there is a "difference between a claim of constructive amendment of an indictment . . . and a variance in the proof and the allegations of the indictment." *Graham v. State*, 185 So. 3d 992, 1001 (¶25) (Miss. 2016). "A constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Short v. State*, 349 So. 3d 193, 195 (¶7) (Miss. Ct. App. 2022). "We recognize that not all variances between the indictment and instructions constitute a constructive amendment or rise to plain error." *Id*. "Instead," our jurisprudence has "previously recognized" the following:

> [a]s long as the change does not materially alter [the] facts which are the essence of the offense on the fac[e] of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood in a way that would prejudice the defendant's case, then the amendment is permissible. Determining whether the defendant is prejudiced by the amendment depends on whether a defense under the original indictment would be equally available

14

under the amended indictment.

*Id*.

¶50.	The State presented evidence of the stick used to break into the victim's home and the knife used to kill the victim. Hill is correct that the weapons were not included in the indictment, but they were not required. Mississippi Code Annotated section 99-7-37(1) states it "shall not be necessary to set forth the . . . *means* by which the death of the deceased was caused." (Emphasis added). Therefore, this issue is without merit.

### IV.	Hill's right to a speedy trial was not violated.

¶51.	Hill argues his constitutional right to a speedy trial was violated because the time between his arrest and his arraignment was over twenty-four months.

¶52.	Criminal defendants are guaranteed the right to a speedy trial by the United States and Mississippi Constitutions. U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890). The Mississippi Supreme Court has held that the right to a speedy trial attaches "at the time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge." *Johnson v. State*, 235 So. 3d 1404, 1417 (¶45) (Miss. 2017). Our Supreme Court has further held a delay of eight months or longer between the date of arrest and the defendant's trial is presumptively prejudicial. *Ward v. State*, 346 So. 3d 868, 870 (¶6) (Miss. 2022). "A presumptively prejudicial delay acts as a triggering mechanism for conducting" the balancing test set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Ward*, 346 So. 3d at 871 (¶6) (internal quotation marks omitted). In *Barker*, the United States Supreme Court developed a four-part test to determine

15

if a defendant's right to a speedy trial was violated. *Bateman v. State*, 125 So. 3d 616, 628 (¶40) (Miss. 2013) (citing *Barker*, 407 U.S. at 530-33). "The relevant factors to be considered are: (1) the length of delay; (2) the reason for delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant has been prejudiced by the delay." *Id*. Where the trial court does not articulate findings of fact, this Court "act[s] de novo in performing the *Barker* analysis." *DeLoach v. State*, 722 So. 2d 512, 516 (¶15) (Miss. 1998).

### a.      Length of Delay

¶53.    Hill was arrested on January 21, 2019, and indicted on January 28, 2021. He was then arraigned exactly two weeks later on February 11, 2021, and his trial began on April 18, 2022. Because the period between Hill's arrest and his trial exceeded eight months, it is presumptively prejudicial. Therefore, a *Barker* analysis is triggered, "and the burden of persuasion shifts to the State to establish good cause for the delay." *Johnson v. State*, 68 So. 3d 1239, 1242 (¶8) (Miss. 2011).

### b.      Reason for Delay

¶54.    "[D]ifferent reasons for delay are assigned different weights." *Williams v. State*, 305 So. 3d 1122, 1132 (¶31) (Miss. 2020). "Deliberate attempts to delay the trial to hamper the defense are weighted heavily against the government." *Id*. "More neutral reasons for the delay, such as negligence or overcrowded courts, are weighted against the government, albeit less heavily." *Id*. "Delays caused by the defense, such as requests for continuances, will toll the running of the speedy-trial clock for the length of time attributable to the continuance."

16

*Courtney v. State*, 275 So. 3d 1032, 1042 (¶27) (Miss. 2019); *see also Brewer v. State*, 725 So. 2d 106, 119 (¶55) (Miss. 1998) (finding that time which passes during the consideration of numerous defense motions does not count against the State).

### i.    Pre-indictment Delay

¶55.    "Where the record is silent regarding the reason for the delay, then the time is counted against the State because the State bears the risk of non-persuasion on the good cause issue." *Harris v. State*, 311 So. 3d 638, 665 (¶80) (Miss. Ct. App. 2020).  However, delays before an indictment are considered investigative delays, and an "investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused." *Id*.

¶56.    Hill was arrested on January 21, 2019, and indicted 738 days, or over two years later, on January 28, 2021.  The record is silent as to the reason for the delay between Hill's arrest and indictment.  But because this delay took place before the indictment, it constitutes an "investigative delay." *Harris*, 311 So. 3d at 665 (¶80).  Furthermore, on March 13, 2020, our Supreme Court entered its first series of Emergency Administrative Orders recognizing the national emergency related to COVID-19 and authorizing trial courts "to exercise their sound discretion in extending deadlines, rescheduling hearings and trials and any other matters by case specific actions or by general orders." *In re: Emergency Order Related to Coronavirus (COVID-19)*, No. 2020-AD-00001-SCT (Miss. March 13, 2020).

¶57.    Therefore, this reason for the delay only slightly weighs in Hill's favor.

### ii.    Post-indictment Delay

17

¶58. After Hill was indicted on January 28, 2021, he was arraigned two weeks later on February 11, 2021. His initial trial was set to begin on May 19, 2021. After his arraignment, Hill began seeking discovery on February 25, 2021. But in his request for discovery, he simultaneously invoked his right to a speedy trial. On April 26, 2021, he formally filed a motion to request speedy trial because he was indicted over two years after his arrest. Nearly a week before trial, Hill stated he would be filing a motion for a mental evaluation. He subsequently agreed to reset his trial to August 25, 2021.

¶59. On May 17, 2021, Hill filed a motion for a mental evaluation to determine his competency to stand trial. Ten days later, the trial court granted the motion. Next, on June 1, 2021, Hill filed a motion for funds for investigative assistance. The trial court granted the motion that same day.

¶60. On June 22, 2021, the trial court sent a letter to Hill's psychologist stating it would draft an order to transport when the doctor was ready to evaluate Hill. The order to transport was filed on July 19, 2021. The order stated that Hill was to be transported to the psychologist on August 14, 2021.

¶61. On August 26, 2021, Hill's trial was reset to December 8, 2021, pending the results of his mental competency evaluation. Both Hill and his attorney signed the order. On December 8, 2021, Hill's trial date was reset again to April 18, 2022. The order noted that the court was "waiting on psych and investigator reports." The order was also signed by both Hill and his attorney and specifically indicated, "The defendant hereby waives the right to a speedy trial."

18

¶62. On February 8, 2022, the trial court entered an order resetting Hill's mental competency hearing and plea negotiations for March 30, 2022. The defendant's trial date was not reset. This order was signed by both Hill and his attorney. On April 1, 2022, the court entered its order determining Hill was competent to stand trial. Hill's trial began on April 18, 2022.

¶63. In sum, the post-indictment delay was 445 days. However, much of the delay is attributable to Hill's own motions. Hill's initial trial date was set for May 19, 2021—111 days after his indictment. However, just two days before the May 2021 trial date, Hill filed a motion for psychiatric evaluation. Much of the delay centered around the psychiatric evaluation. The State was then prepared to try Hill's case on August 25, 2021, but because of the pending results of his mental evaluation, the trial date was reset again to December 8, 2021. The State was again prepared to try the case on the December date, but because the trial court was waiting on the psychiatric and investigative reports, the trial date was reset again to April 18, 2022. The trial proceeded forward on the April date after multiple continuances, even amidst restrictions due to the COVID-19 pandemic.

¶64. After review, we find there is no evidence of any "deliberate attempts" by the State to delay the trial. Critically, the record reflects the State was prepared to proceed as early as 111 days after his indictment. Because the "time which passes during the consideration of numerous defense motions does not count against the State," we find that the 445-day delay between Hill's indictment and his trial weighed against Hill. *Brewer*, 725 So. 2d at 119 (¶55).

### iii. Balancing the Weight of the Delay

¶65. The delay between Hill's arrest and his indictment spanned 738 days. The State did not provide an explanation for the delay, but because this delay occurred before the indictment, it constitutes an "investigative delay." *Harris*, 311 So. 3d at 665 (¶80). Also during this period, our Supreme Court entered a series of orders regarding the COVID-19 pandemic. Therefore, this delay weighs slightly in Hill's favor. On the contrary, the delay between his indictment and his trial was largely due to his own motion for mental evaluation. Therefore, this period of delay weighs in favor of the State. Overall, we find the reason for the delay weighs against Hill.

### c.     Assertion of the Right to a Speedy Trial

¶66. "Although it is the State's duty to insure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right." *Eubanks v. State*, 341 So. 3d 896, 904-05 (¶13) (Miss. 2022). "This Court has held that this factor weighs against a defendant who waits a significant amount of time after arrest to demand a speedy trial." *Id.*; *see also Noe v. State*, 616 So. 2d 298, 301 (Miss. 1993) (defendant's failure to assert his right to a speedy trial "nearly an entire year following his arrest" weighed against him); *Wall v. State*, 718 So. 2d 1107, 1113 (¶25) (Miss. 1998) (defendant's assertion of his right to a speedy trial "merely two months before he received a trial" weighed against him). "[A] defendant's failure to demand a speedy trial between his arrest and indictment is critical to the analysis of a speedy-trial claim." *Bateman*, 125 So. 3d at 630 (¶49).

¶67. Hill first asserted his right to a speedy trial on February 5, 2021, with his motion for discovery. He then filed a pro se motion for a speedy trial on April 26, 2021. That is, Hill

did not assert his right to a speedy trial until over two years after his arrest and nearly three months after his indictment. Plainly stated, Hill never asserted his right to a speedy trial between his arrest and his indictment. Furthermore, Hill's motion for a speedy trial was contradicted by his own simultaneous motion for discovery.

¶68. Because Hill did not make a timely assertion of his right to a speedy trial, this factor weighs in favor of the State.

### d. Prejudice

¶69. Hill argues his defense was impaired by the delay because "the attorney considered him and his case less important th[a]n his other cases[.]"

¶70. "When analyzing the last *Barker* factor, this Court should consider the following three interests: (1) preventing oppressive incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Eubanks*, 341 So. 3d at 905 (¶17). "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*.

¶71. In his pro se speedy trial motion, he alleged he "ha[d] witnesses that [were] willing to testify on [his] behalf, but the delay . . . put[] a strain on [his] defense." He further alleged that because of the delay, witnesses could become available or the victim's family would persuade his witness not to testify. He also argued the witnesses' memories could fade.

¶72. While Hill argues there were witnesses willing to testify, he failed to identify those witnesses. Further, he did not explain what the testimony of the witnesses would be and how this testimony would aid in his defense. The defendant's heat-of-passion argument centers

21

on the alleged infidelity of Lashawnda. Even if he could identify the witnesses and their testimony, there is ample evidence from his own testimony at trial that Hill had a substantial cooling off period. First, the jury heard and saw video footage of Hill's interview with the officers. In that interview, he confessed to leaving his home with the intention of killing his wife, breaking into her home, and stabbing her multiple times. Further, he admitted calling five people before leaving his house—signifying a substantial cooling-off period. Critically, Hill never denied the gruesome details of his attack or that he walked five miles to Lashawnda's home. Because of such overwhelming evidence, Hill's failure to provide testimony regarding his mental or emotional state did not prejudice his defense.

¶73. Balancing the *Barker* factors, we find that Hill's right to a speedy trial was not violated.

### CONCLUSION

¶74. We find the trial court properly refused Hill's lesser-included-offense instruction of heat-of-passion manslaughter. We also find his indictment was not defective. Furthermore, Hill's indictment was not constructively amended. Finally, Hill's right to a speedy trial was not violated.

¶75. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND EMFINGER, JJ., CONCUR. SMITH, J., NOT PARTICIPATING.**

22