# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00489-COA

**EDWIN TERRELL BROWN A/K/A EDWIN BROWN A/K/A EDWIN TERREL BROWN**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/24/2024 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | CHARLES RICHARD MULLINS |
| | COURTNEY DENISE SANDERS |
| | MADELINE BEARD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/10/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Edwin Brown was convicted of capital murder and armed robbery in the Sunflower County Circuit Court. For his capital murder conviction, the trial court sentenced Brown to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole or probation. For his armed robbery conviction, the trial court sentenced Brown to ten years in the MDOC's custody, with five years suspended on the condition of completing five years of post-release supervision. The trial court ordered Brown's sentence for armed robbery to run consecutively to his sentence for capital murder.

Brown now appeals his convictions and sentences.

¶2. On appeal, Brown asserts the following assignments of error: (1) his due process right to a fair trial was violated when the trial court denied his motion for a mistrial or dismissal; (2) the trial court erred in admitting testimony regarding a firearm; (3) the trial court erred in admitting evidence of Brown's other crimes; (4) the trial court erred in admitting into evidence the confession of Brown's co-defendant Derrion Eloby; and (5) the jury's verdict was contrary to the overwhelming weight of the evidence.

¶3. After our review, we find no error. We therefore affirm Brown's convictions and sentences.

**FACTS**

¶4. On August 10, 2012, Merio Harris and his roommate Nathan Williams were robbed in their home in Drew, Mississippi. During the course of the robbery, Williams was shot and killed.

¶5. Harris testified that on the evening of the shooting, he and Williams were selling marijuana from their house, after which they retired to their individual bedrooms, and Harris began counting his money. At approximately 10:30 or 11:00 p.m., two men wearing ski masks and carrying firearms entered Harris's bedroom. Harris testified that he did not know the men and could not see their faces because they wore masks. One man pointed a gun at Harris and told him to "give it up and lay down," referring to the money Harris was counting. Harris complied. Several minutes later, Harris heard a gunshot in another part of the house. He got up, walked to the hallway, and discovered Williams lying on the floor. Harris called

2

911 and then drove Williams to the hospital. Williams eventually died from his injuries.

¶6. Chief Deputy Marvin Flowers of the Sunflower County Sheriff's Department investigated the robbery and murder. During his investigation, Chief Deputy Flowers spoke with Harris, as well as Brian Hannon, Sophia Sharkey, and Cartisha Banks. Banks testified that on the night of the incident, she, Sharkey, and Hannon rode in Sharkey's truck to Harris and Williams's house to purchase marijuana. They pulled up to the house, and Hannon exited the vehicle. Banks testified that as Hannon approached the door to the house, three men "with masks and guns" came out the door and went to the back of the house. Hannon then entered the house, and Sharkey pulled her truck out of the driveway to follow the three men with guns. Sharkey and Banks proceeded to follow the men, and they observed the men get into a dark-colored truck. Sharkey, Banks, and Hannon then followed behind Harris as he drove Williams to the hospital. While driving to the hospital, Sharkey announced that she had spotted the masked men's vehicle. Sharkey called the police and provided the tag number of the vehicle.

¶7. Harris testified that a day after the shooting, he found a shell casing in his bedroom. Harris alerted the sheriff's department, and Harris testified that someone from the sheriff's department came to his house and collected the shell casing. At trial, Chief Deputy Flowers denied that a shell casing was recovered from Harris's home.

¶8. The case eventually went cold until 2013, when Investigator Bill Staten from the Leflore County Sheriff's Department contacted Chief Deputy Flowers and informed him that he had detained someone with information related to the case. Chief Deputy Flowers went

3

to the Leflore County Sheriff's Department and spoke with Davontay Brown. After speaking with him, Chief Deputy Flowers searched Davontay Brown's cell phone and Facebook page. Based on information he gleaned from these searches, Chief Deputy Flowers obtained a warrant for Brown, Jabrandon Green, Derrion Eloby, and Carlos Jones.

¶9. In 2015, a Sunflower County grand jury indicted Brown, Eloby, Green, and Jones for one count of capital murder with the underlying crime of armed robbery and a standalone count of armed robbery. In 2021, the original indictment was nolle prosequied due to a defect, and a second Sunflower County grand jury indicted each of the Defendants for one count of capital murder with the underlying crime of burglary and one count of armed robbery. Each charge included an added firearm enhancement.

¶10. Before trial, Green—after agreeing to a plea deal with the State and agreeing to testify against Brown, Eloby, and Jones—successfully moved to sever his trial from his co-defendants.

¶11. Brown, Eloby, and Jones (collectively, the Defendants) were jointly tried on January 30, 2024, through February 2, 2024. At trial, the jury heard testimony from Harris, Banks, Chief Deputy Flowers, and Green, as well as Dr. Mark LeVaughn, a forensic pathologist at the Mississippi State Medical Examiner's Office; Officer Kevin Nelson of the City of Horn Lake Police Department; Investigator Darrell Saxton of the Sunflower County Sheriff's Department; Mark Boackle of the Mississippi Forensics Laboratory, an expert in the field of firearms and toolmarks; and Audra Brown, Brown's wife.

¶12. After Chief Deputy Flowers testified, the defendants moved for a mistrial. Counsel

4

for the Defendants claimed that Chief Deputy Flowers indicated through his testimony[1] that evidence was intentionally destroyed and that some of the State's evidence was not disclosed to the Defendants. The Defendants also asserted that these evidentiary issues were relevant to their motion to dismiss based on a speedy trial violation, and they renewed their speedy trial motion. After hearing arguments from counsel, the trial court denied the motions for a mistrial or dismissal, and the trial continued.

¶13. Green testified that on the night of the shooting, he and the Defendants drove to Harris and Williams's residence with the intention of robbing the house. According to Green, Brown drove the men in his silver Pontiac car. The men drove past the house to make sure the coast was clear, and then Brown parked his car on a gravel road, out of sight. Green, Eloby, and Jones then exited the vehicle carrying guns and ski masks. Green testified that Jones entered the house through a window and then opened the door to allow Green and Eloby inside. Green claimed that during the robbery, Eloby ordered Williams to lie down, and when Williams refused, Eloby shot him.

¶14. Dr. LeVaughn testified that Williams was shot in the left shoulder and died as a result of internal bleeding. Dr. LeVaughn opined that Williams's manner of death was homicide. During Williams's autopsy, a bullet was recovered from his body, and the sheriff's department sent the bullet to the Mississippi Forensics Laboratory.

¶15. Officer Nelson testified that at approximately 7:30 p.m. on August 11, 2012, the evening after the shooting, he was sitting in a patrol car at an intersection in Horn Lake,

---

[1] We will further discuss Chief Deputy Flowers's testimony and Brown's claim regarding the State's evidence in our analysis below.

Mississippi. Officer Nelson observed that the driver of a passing vehicle was not wearing a seatbelt and that the two people inside the vehicle "appeared noticeably nervous." Officer Nelson proceeded to conduct a traffic stop of the vehicle. Officer Nelson testified that Davontay Reedus and Eloby were the occupants of the vehicle. During a search, officers found 1.6 grams of marijuana separately packaged on Eloby's person and $190 in cash in $5 denominations. A K-9 search revealed a Taurus 9mm handgun underneath the front passenger seat where Eloby was sitting, and Eloby was charged with possession of a handgun by a minor.

¶16. In April 2021, Chief Deputy Flowers learned that the Horn Lake Police Department had taken possession of Eloby's gun during the traffic stop in 2012. Investigator Darrell Saxton testified that upon orders from Chief Deputy Flowers, he had retrieved the gun and logged it into evidence at the Sunflower County Sheriff's Department. Investigator Saxton then took the gun to the Mississippi Forensics Laboratory and advised the laboratory staff that they needed to compare the gun to the projectile (bullet) recovered from Williams's body. According to Investigator Saxton, laboratory staff informed him that they had returned the projectile to Chief Deputy Flowers. Investigator Saxton eventually located the projectile in the evidence room at the sheriff's department, and he returned the projectile to the Mississippi Forensics Laboratory.

¶17. Mark Boackle testified as an expert in the field of firearms and tool marks. Boackle testified that he analyzed Eloby's Taurus 9mm gun and the projectile recovered from Williams's body. Boackle opined that the projectile "bears class characteristics consistent

with 9mm." However, in comparing the projectile to the gun, Boackle determined that while the projectile had similar class characteristics with those produced by Eloby's gun, it "could not be positively included or excluded as having been fired in [Eloby's] gun . . . to the exclusion of all other firearms bearing the same class characteristics." Boackle testified that this conclusion was due to the mutilation and "insufficient reproduction" of the projectile recovered from Williams's body. Boackle explained that the projectile's outer covering had "ripped away from the core" of the bullet, and this mutilation made it hard to further classify or identify whether the projectile was shot from Eloby's gun. Boackle testified that a projectile jacket can sometimes separate from the core of the bullet when the gun is fired or when the projectile hits something hard, like "bone, glass, [or] metal."

¶18. After the State rested its case-in-chief, the Defendants moved for directed verdicts, arguing that the State had not met its burden of establishing a prima facie case of capital murder and armed robbery against the Defendants. The trial court denied the motion.

¶19. Finally, Brown's wife, Audra, testified as Brown's alibi witness. Audra testified that on the evening of the shooting, Brown was at home babysitting their infant grandchild while Audra was at work. Audra stated that when she arrived home around 9:45 p.m. on the evening of August 10, 2012, Brown and their grandchild were both asleep. Audra posted a picture of Brown and their grandchild, both asleep, on Facebook and captioned the photo "Why they couldn't wait on me to get home 8/10/12." Audra also testified that on August 11, 2012, she and Brown went to a restaurant and to the movies, and she posted a picture of the two of them on Facebook and captioned the picture "A night on the town 08/11/12."

7

Both pictures were entered into evidence, and each picture's caption and date were posted across the center of the photo. Audra testified that the dates contained in the captions were autogenerated. During closing arguments, the State disputed Audra's claim that the dates in Facebook captions were autogenerated, and the State encouraged the jury to use common sense as to whether Audra herself placed the date on the caption. Audra also testified that neither she nor Brown had ever owned a silver Pontiac car.

¶20. The jury ultimately returned a verdict finding the Defendants guilty of capital murder, with the underlying charge of burglary, and armed robbery. For his capital murder conviction, the trial court sentenced Brown to life imprisonment in the custody of the MDOC without eligibility for parole or probation. For his armed robbery conviction, the trial court sentenced Brown to ten years in the MDOC's custody, with five years suspended on the condition of completing five years of post-release supervision, set to run consecutively to his sentence for capital murder.

¶21. Brown filed a motion for judgment notwithstanding the verdict or a new trial, which the trial court denied. This appeal followed.

## DISCUSSION

### I. Violation of Brown's Due Process Rights

¶22. Brown first argues the State violated his due process right to a fundamentally fair trial; accordingly, he argues the trial court erred by denying his motions for a mistrial and dismissal.

¶23. The decision "to grant a motion for a mistrial is within the sound discretion of the trial

court. The standard of review for [a] denial of a motion for a mistrial is abuse of discretion." *Dorsey v. State*, 310 So. 3d 1238, 1247 (¶26) (Miss. Ct. App. 2021). "A trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Young v. State*, 281 So. 3d 179, 186 (¶29) (Miss. Ct. App. 2019) (quoting *Hutto v. State*, 227 So. 3d 963, 984 (¶66) (Miss. 2017)). However, we review de novo a trial court's denial of a defendant's motion to dismiss. *Lewis v. State*, 295 So. 3d 521, 531 (¶26) (Miss. Ct. App. 2019).

### A. Destruction or Loss of Exculpatory Evidence

¶24. Brown asserts that the State's destruction, loss, and mishandling of evidence violated his due process rights. Brown claims that he was prejudiced due to the unavailability of exculpatory evidence, namely, the missing audio files of recorded witness interviews and Chief Deputy Flowers's sticky notes that he used to draft his final case report. Brown also asserts that the State erred by mishandling and failing to test the shell casing that Harris claimed he turned over to law enforcement and that the State mishandled the projectile recovered from Williams's autopsy, which deprived Brown of the ability to prove its exculpatory value.

¶25. We recognize that "[t]he State has the duty to preserve evidence . . . which might be expected to play a significant role in the suspect's defense." *Northup v. State*, 793 So. 2d 618, 623 (¶16) (Miss. 2001) (quotation mark omitted). To determine whether the State violated Brown's due process rights based upon destruction or spoliation of evidence, Brown must show the following:

(1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that [Brown] would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Robinson v. State*, 247 So. 3d 1212, 1234 (¶56) (Miss. 2018).  Brown must meet all three of these requirements to successfully prove that his due process rights were violated.  *Childs v. State*, 133 So. 3d 348, 350 (¶10) (Miss. 2013).

¶26.   Regarding Brown's claim that the State mishandled the projectile recovered from Williams's autopsy, we find nothing in the record to support this claim.  Although the testimony at trial reflects that the projectile was damaged, Boackle testified that a projectile's outer covering can sometimes separate from the core of the bullet when the gun is fired or when the projectile hits something hard, like "bone, glass, [or] metal."  As for the shell casing that Harris claims law enforcement collected from his bedroom, Chief Deputy Flowers testified at trial and denied that a shell casing was recovered from Harris's home

¶27.   Chief Deputy Flowers also testified regarding his investigation of the shooting.  After Chief Deputy Flowers developed suspects, he issued arrest warrants for the Defendants.  Chief Deputy Flowers testified that he interviewed Eloby in July 2013, and during that time Eloby implicated Green as the person who shot Williams.  Chief Deputy Flowers recorded his 2013 interview with Eloby.  Eloby also provided a written statement.  Chief Deputy Flowers admitted that "throughout the years, [the recorded interview] got misplaced."  However, Eloby's written statement was entered into evidence at trial.

¶28.   During cross-examination, counsel for the Defendants questioned Chief Deputy

10

Flowers about his law enforcement training for conducting an investigation. Chief Deputy Flowers agreed that he was trained to keep up with everything relevant to each investigation and include the information in a report. Counsel for the Defendants asked Chief Deputy Flowers about the recordings of his interviews with various witnesses to the shooting. Chief Deputy Flowers testified that over the course of the years, the recordings had been "misplaced."

¶29. Chief Deputy Flowers also testified that as he conducted his investigation in this case, he made notes on a sticky pad and a notepad to help him prepare his offense report. Chief Deputy Flowers admitted that after he prepared his offense report, he did not include his handwritten notes in the case file, explaining, "That was years ago." When asked by counsel for the Defendants where he put his handwritten notes, Chief Deputy Flowers answered, "I don't know where I put them . . . . Probably [threw] them away." Chief Deputy Flowers did not recall when he threw the notes away, explaining, "This has been over 12, 13 years." However, Chief Deputy Flowers testified that the offense report he prepared contained the information from his handwritten notes.

¶30. Counsel for Defendants also questioned Chief Deputy Flowers about arrest warrants he issued for people other than the Defendants, namely, Tasha Green and Vanquilla Johnson. Chief Deputy Flowers stated that he did arrest Tasha and Vanquilla and interviewed them regarding the shooting. Chief Deputy Flowers testified that he recalled taking a written statement from Tasha and Vanquilla and that their statements "should" be incorporated into the case file. Upon reviewing the case file, Chief Deputy Flowers clarified that he did *not*

11

take written statements from Tasha and Vanquilla. When asked about previously testifying that he *had* taken written statements from Tasha and Vanquilla, Chief Deputy Flowers explained that the misstatement was due to the long amount of time that had passed since the interviews.

¶31. After Chief Deputy Flowers's testimony, counsel for the Defendants moved for a mistrial and a motion to dismiss in tandem on the grounds of due process violations and speedy trial violations. The Defendants argued that the State's failure to turn over Chief Deputy Flowers's handwritten statements and notes from the interviews with witnesses Tasha and Vanquilla constituted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963).[2] The Defendants also argued that the State's failure to preserve certain evidence and the destruction of evidence violated their due process rights. The Defendants asserted they were unaware that the statements and notes existed until trial. The Defendants admitted that the content of Chief Deputy Flowers's notes was unknown, but counsel for the Defendants argued that "that there is a very strong potential that all this evidence had potential impeachment value upon at least one possible witness, if not more." The Defendants maintained that if the trial court did not grant their motion, then they were entitled to a spoliation-of-evidence instruction based on Chief Deputy Flowers's intentional destruction of evidence.

---

[2] On appeal, Brown maintains that the failure to turn over interview notes and handwritten statements was a *Brady* violation. However, the testimony at trial shows that this evidence was either destroyed or did not exist; therefore, the State could not turn over this evidence. This issue is more appropriately addressed by using the three-prong test above to determine whether the State's failure to preserve evidence violated the defendant's right to due process, as set forth in *Robinson*, 247 So. 3d at 1234 (¶56).

¶32.   In response, the State argued that the Defendants' claims regarding the preservation of evidence did not rise to the level of a due process violation.

¶33.   After hearing arguments from counsel, the trial court denied the motions for a mistrial and dismissal.  In applying the relevant factors for destruction or spoliation of evidence, the trial court found "[t]here is no clear indication that any of the evidence that is no longer available possesses any exculpatory value."  The trial court explained that the discovery made available by the State did not indicate that any statements or information from Tasha and Vanquilla would have been exculpatory concerning the murder and robbery at issue.  As to whether the evidence was of such a nature that the Defendants would be unable to obtain comparable evidence by other reasonably available means, the trial court weighed this prong heavily—but not fully—in favor of the Defendants.  The trial court explained that no one had presented any evidence to show that Tasha and Vanquilla were unavailable to be interviewed.  Finally, the trial court found no evidence to show that Chief Deputy Flowers destroyed the evidence in bad faith.  The trial court acknowledged that Chief Deputy Flowers did misplace, lose, and even destroy some evidence, but the trial court determined that this was a result of the passage of time and not a deliberate effort to destroy evidence.

¶34.   After reviewing the record, we find that the trial court did not abuse its discretion in denying Brown's motion for a mistrial or dismissal.  Brown failed to show that the evidence at issue possessed apparent exculpatory value.  Regarding Chief Deputy Flowers's interviews with Tasha and Vanquilla, Brown presented no evidence to show that they were unavailable to be interviewed; accordingly, Brown failed to show that he was unable to obtain

13

comparable evidence by other reasonably available means. Finally, the record contains no evidence that Chief Deputy Flowers destroyed any evidence in bad faith. *Robinson*, 247 So. 3d at 1234 (¶56).

### B. Violation of Right to a Speedy Trial

¶35. Brown also argues that his constitutional right to a speedy trial was violated.[3]

¶36. "The United States and Mississippi Constitutions guarantee criminal defendants the right to a speedy trial." *Newell v. State*, 175 So. 3d 1260, 1269 (¶9) (Miss. 2015) (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890)). When examining whether a defendant's right to speedy trial was violated, we apply the four-part test developed by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Id*. The *Barker* test requires consideration of the following factors: "(1) the length of delay; (2) the reason for delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant has been prejudiced by the delay." *Id*. (citing *Barker*, 407 U.S. at 530-33). The *Barker* Court explained that the four factors are "related factors and must be considered together with such other circumstances as may be relevant." *Id*. at 533.

¶37. The record reflects that Eloby filed a pre-trial motion to dismiss due to the violation of his right to a speedy trial. At the May 2021 hearing on the motion, Brown announced that he was joining the motion to dismiss. On February 22, 2022, the trial court entered an order denying Eloby and Brown's motion.

¶38. "A trial judge's ruling on a speedy-trial claim encompasses questions of fact,

---

[3] Brown does not assert that his statutory right to a speedy trial was violated. *See* Miss. Code Ann. § 99-17-1 (Rev. 2020).

14

including whether there was 'good cause' for a delay and whether the defendant has been prejudiced by any delay." *Berryman v. State*, 337 So. 3d 1116, 1126 (¶33) (Miss. Ct. App. 2021) (quoting *State v. Woodall*, 801 So. 2d 678, 680-81, 687 (¶¶7, 29, 31) (Miss. 2001)). "We must affirm the trial judge's factual findings if they are supported by substantial, credible evidence[,] . . . [and] [w]e will reverse the trial judge's factual findings only if there is no probative evidence to support them and they are clearly erroneous." *Id*. (internal quotation marks omitted).

### 1.     Length of the Delay

¶39.    "The constitutional right to a speedy trial attaches when a person has been accused. Therefore, the speedy-trial clock begins running 'with the defendant's arrest, indictment, or information,' whichever occurs first." *Berryman*, 337 So. 3d at 1126 (¶34) (citation omitted) (quoting *Stark v. State*, 911 So. 2d 447, 450 (¶7) (Miss. 2005)). "'[A]ny delay exceeding eight months is presumptively prejudicial' and requires analysis of the remaining *Barker* factors." *Id*. at 1126-27 (¶34).

¶40.    Here, the record shows that Brown was originally indicted in April 2015 and that he was arrested in February 2019. The trial took place in January 2024. The delay in this case was greater than eight months; therefore, we find that the trial court correctly considered the remaining *Barker* factors in assessing Brown's speedy trial claim.

### 2.     Reasons for the Delay

¶41.    "Once the delay is deemed presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay and to persuade the trier of fact of the

legitimacy of these reasons." *McBride v. State*, 61 So. 3d 138, 142 (¶9) (Miss. 2011). "This Court must then determine whether the delay is attributable to the State or the defendant." *Berryman*, 337 So. 3d at 1127 (¶36). "Different reasons for delay are assigned different weights." *Id*. "Deliberate attempts to delay the trial in order to hamper the defense are weighed heavily against the State." *Id*. However, "[d]elays caused by the defense, such as requests for continuances, will toll the running of the speedy-trial clock for the length of time attributable to the continuance." *Courtney v. State*, 275 So. 3d 1032, 1042 (¶27) (Miss. 2019). Likewise, "[a]greed continuances are weighed against the defense." *Id*. at 1042 (¶29).

¶42. On appeal, the State maintains that the trial docket reflects that the majority of the delay is attributed to the Defendants' motions for continuance of the trial date. The record reflects that the Defendants were initially indicted on April 20, 2015. The Defendants filed approximately twelve motions for continuances, which the trial court granted on June 23, 2015; November 20, 2015; March 14, 2016; February 28, 2019; July 7, 2019; February 26, 2020; June 24, 2020; October 26, 2020; April 22, 2021; October 8, 2021; and February 10, 2022. The trial docket shows that over half of the orders granting continuances were agreed upon by the State. Eloby also filed a motion for a mental evaluation, which the trial court granted on February 24, 2016.

¶43. The court granted the motions for continuances that Brown and his co-defendants filed. This Court has held that "[g]enerally, continuances granted to a codefendant for good cause operate as good-cause delays as to jointly charged defendants." *Harris v. State*, 174 So. 3d 314, 319 (¶23) (Miss. Ct. App. 2015). On appeal, Brown "offered no evidence that

16

his codefendant's continuances were not for good cause." *Id*. Additionally, the record reflects that Brown did not seek a severance from his co-defendants, nor did he object to the continuances. *See Bates v. State*, 886 So. 2d 4, 8 (¶11) (Miss. Ct. App. 2004) (finding that a defendant's failure to seek a severance or object to continuances granted to his co-defendant cut against the defendant's speedy-trial claim).

¶44. In its order denying Brown's motion to dismiss, the trial court assessed this prong and held that "[t]he practical reality of the court's congested docket, Eloby's pending mental evaluation and the (agreed) continuances should not be weighed against the State." The trial court properly found that the delays from the continuances should not be weighed against the State. *See Harris*, 174 So. 3d at 319 (¶24).

### 3. Assertion of Right to a Speedy Trial

¶45. "Although it is the State's duty to ensure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right." *Taylor v. State*, 162 So. 3d 780, 785 (¶10) (Miss. 2015) (quoting *Bateman v. State*, 125 So. 3d 616, 630 (¶49) (Miss. 2013)). The Mississippi Supreme Court has held that "a defendant's failure to demand a speedy trial between his arrest and indictment is 'critical' to the analysis of a speedy-trial claim." *Id*. The supreme court has weighed this prong against a defendant where the defendant allows a "significant amount of time to pass after arrest before demanding a speedy trial[.]" *Id*. (quotation marks omitted).

¶46. On appeal, Brown maintains that he "consistently raised and preserved his speedy trial objection and joined the motion to dismiss on that ground." However, the trial court docket

below does not reflect that Brown filed any speedy trial motions. As acknowledged above, the record shows that at the May 2021 pre-trial motion hearing on Eloby's motion to dismiss due to the violation of his right to a speedy trial, Brown announced that he was joining Eloby's motion. The supreme court has clarified that "the filing of a motion to dismiss does not equate to an assertion of the right to a speedy trial." *Moffett v. State*, 49 So. 3d 1073, 1087 (¶39) (Miss. 2010).

¶47. After our review, we find that this factor weighs against Brown.

### 4. Prejudice

¶48. "The final prong of *Barker* encompasses two aspects: actual prejudice in defending the case and interference with the defendant's liberty." *Bateman*, 125 So. 3d at 631 (¶51). "The three main considerations in determining whether the accused was prejudiced by a lengthy delay are: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id*. (internal quotation marks omitted). The defendant "bears the burden of showing actual prejudice, since the defendant is clearly in the best position to show prejudice under this prong." *Reed v. State*, 191 So. 3d 134, 141 (¶19) (Miss. Ct. App. 2016) (internal quotation marks omitted).

¶49. Here, Brown argues that he was prejudiced by the delayed trial in multiple ways. First, Brown claims that the destruction of Chief Deputy Flowers's original notes and the inability to retrieve original recordings of witness statements materially impaired his ability to cross-examine, challenge, and impeach the State's evidence and witnesses. Brown also

18

asserts that the "faded memories" of key witnesses undermined the integrity of the fact-finding process. Finally, Brown claims that he endured anxiety and suffered reputation harm while awaiting trial.

¶50. The State argues that none of Brown's claims of prejudice rises to the level of actual prejudice under *Barker*. The State also maintains that Brown was incarcerated for unrelated charges during approximately four years of the pretrial period, which further undercuts his claim of pretrial oppression. *See Wall v. State*, 718 So. 2d 1107, 1113 (¶26) (Miss. 1998) (recognizing that a defendant cannot claim anxiety of incarceration when serving time for another crime). We agree, and we find that Brown failed to meet his burden of showing actual prejudice.

### 5. Summary of the *Barker* Factors

¶51. "In weighing the *Barker* factors, we must consider the 'totality of the circumstances,' and 'no one factor is dispositive.'" *Berryman*, 337 So. 3d at 1131 (¶53) (quoting *Price v. State*, 898 So. 2d 641, 648 (¶11) (Miss. 2005)).

¶52. Of the four *Barker* factors, only the length of delay in this case favors Brown. As discussed, much of the delay in this case is attributed to the Defendants' motions for a continuance of the trial date. Furthermore, Brown failed to assert his right to a speedy trial, and he has not shown actual prejudice. Because we find no constitutional speedy trial violation in this case, we find that the trial court did not err in denying Brown's motion to dismiss based on a speedy trial violation.

### II. Testimony Regarding the Taurus 9mm Firearm

19

¶53. Brown next argues that the trial court abused its discretion by admitting into evidence the Taurus 9mm firearm, as well as testimony from Officer Nelson regarding the Taurus 9mm firearm. Brown asserts that the probative value of the testimony regarding the firearm was substantially outweighed by the dangers of unfair prejudice and misleading the jury.

¶54. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Roberson v. State*, 199 So. 3d 660, 668 (¶32) (Miss. 2016). "Relevance is a threshold requirement of admissibility." *Ross v. State*, 954 So. 2d 968, 992 (¶44) (Miss. 2007); MRE 402. Evidence is considered relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the case." MRE 401. The supreme court has held that "Rule 401 is construed broadly in favor of admitting evidence with even slight probative value." *Ross*, 954 So. 2d at 993 (¶44). However, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403. We recognize that the decision of whether to exclude relevant evidence under Rule 403 "is committed to the broad discretion of the trial judge, and our standard of review is highly deferential." *Wallace v. State*, 369 So. 3d 83, 89 (¶19) (Miss. Ct. App. 2023).

¶55. As discussed above, Officer Nelson testified that he performed a traffic stop of a vehicle in which Eloby was the passenger, and the firearm was discovered under Eloby's seat. Eloby was charged with possession of a handgun by a minor. At trial, Eloby's counsel

objected to Officer Nelson testifying regarding the discovery of the gun under Eloby's seat during the traffic stop. Counsel argued, "[T]here is no indication that this particular gun was actually tied to the murder[,]" and counsel referenced the report from Boackle regarding the projectile and the gun. Counsel argued that any testimony from Officer Nelson about confiscating the gun from Eloby "would be overly prejudicial and confusing to the jury." After hearing arguments from counsel, the trial court found that Officer Nelson's testimony had probative value and overruled Eloby's objection.

¶56.    Later, during Boackle's testimony, the State introduced into evidence the Taurus 9mm firearm recovered from Eloby during the traffic stop in Horn Lake the day after the shooting. Boackle tested the projectile and firearm and concluded that the projectile "bears similarities in class characteristics with those produced by the gun." However, due to the condition of the projectile, Boackle could not positively include or exclude it as having been shot from Eloby's Taurus 9mm firearm.

¶57.    Despite Brown's statement that the trial court "allowed the firearm into evidence over objection[,]" the transcript reflects that none of the Defendants objected to the admission of the firearm into evidence. "A defendant's failure to object to the admission of evidence at trial waives his right to raise the issue on appeal"; accordingly, we find that Brown waived any argument regarding admission of the actual firearm into evidence. *Smith v. State*, 398 So. 3d 875, 890-91 (¶29) (Miss. Ct. App. 2023). We therefore limit our analysis to whether the trial court erred in admitting Officer Nelson's testimony regarding the firearm.

¶58.    Brown argues that the testimony regarding the firearm allowed the State to unfairly

21

imply a connection between Eloby's gun and Brown's involvement in the shooting. Brown maintains that he had no connection to the firearm, and therefore this testimony unfairly prejudiced the jury against him and undermined the integrity of the proceedings.

¶59. However, the supreme court has held that "[w]hen there is evidence that a weapon could have caused an injury and some connection between the defendant and the weapon exists, the weapon will be deemed relevant and admissible." *Ross*, 954 So. 2d at 993 (¶46). Green testified that he, Brown, Eloby, and Jones committed the robbery at issue and that Eloby shot and killed Williams during the robbery. Testimony at trial shows that the firearm at issue was confiscated from Eloby during a traffic stop. Green testified that Eloby told Green that his gun "got confiscated."

¶60. After our review, we find that "[b]ecause there was evidence that the gun could neither be included or excluded as the weapon that caused [Williams's] death, and that [Brown's co-defendant Eloby] exercised dominion and control over the gun . . . , there was sufficient proof that the [testimony regarding the] gun was relevant." *Rhodes v. State*, 676 So. 2d 275, 283-84 (Miss. 1996). We therefore find that the trial court did not abuse its discretion in admitting Officer Nelson's testimony regarding the Taurus 9mm firearm.

### III.    Admission of Evidence of Brown's Other Crimes, Wrongs, or Acts[4]

¶61. Brown argues that the trial court erred in admitting evidence of his other crimes,

---

[4] In the State's appellate brief, the State asserts that regarding this issue, Brown cites three cases that do not exist and five others that his brief misattributes false facts, analyses, quotations, and holdings to otherwise genuine citations. Brown also cites seven cases for quotations that do not appear in those opinions. In the reply brief, Brown's counsel acknowledged these errors, which included "phantom cases" and incorrect citations.

wrongs, or acts. Brown argues that this testimony was irrelevant, highly prejudicial, and impacted the jury's perception of Brown's character.

¶62. "Generally, evidence of other crimes, wrongs, or acts is prohibited to prove a person's character in order to show he acted in accordance with that character." *Culberson v. State*, 419 So. 3d 926, 940 (¶59) (Miss. Ct. App. 2025); MRE 404(b)(1). However, under Mississippi Rule of Evidence 404(b)(2), evidence of other crimes may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). Before a trial court admits such evidence, the court "must find (1) the evidence is offered for a permissible purpose under Rule 404(b) . . . , and (2) the evidence's probative value outweighs its prejudicial effect under Rule 403 . . . ." *Parks v. State*, 228 So. 3d 853, 868 (¶58) (Miss. Ct. App. 2017). We review a trial court's decision to admit evidence of a defendant's other crimes, wrongs, or acts for an abuse of discretion. *Bradshaw v. State*, 371 So. 3d 822, 836 (¶41) (Miss. Ct. App. 2023).

¶63. The State maintains that the testimony about Brown's other wrongs, crimes, or acts was properly admitted under Rule 404(b) to demonstrate a common plan, intent, and motive relevant to the charged offense. The State asserts that the evidence was offered for a non-character purpose and was highly probative of a broader scheme involving the four accomplices and their charged acts.

¶64. The record indicates that Brown submitted a motion in limine to exclude evidence of his other wrongs, crimes, or acts and that Eloby and Jones joined the motion. The trial court

23

held a pretrial hearing on the motion. At the hearing, the State announced that it intended to offer evidence of Brown's other crimes to prove "intent, preparation, motive, and plan and . . . modus operandi." The State explained that Green would testify that the details of the shooting and robbery at issue are "identical" to subsequent crimes that Green and Brown had committed in other counties, namely, that Brown was always involved in the preparation of the robbery and always drove to the location and that Green and another person would always exit the vehicle and commit the robbery. The trial court denied Brown's motion and ruled that pursuant to Rule 404(b), the State could introduce evidence of Brown's criminal activity for the limited purposes of intent, plan, preparation, motive, and opportunity and "to tell a complete story of the events leading to the subject incident."

¶65. During Green's testimony, Brown's counsel renewed her objection to Green testifying about Brown's other crimes. The trial court overruled the objection and allowed the testimony for the limited purpose of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The trial court referenced its prior written order and stated that the court had already made a determination that the testimony's "probative value is not outweighed by any prejudice that it will cause."

¶66. At trial, Green testified that he was currently serving time for aggravated assault, kidnapping, robbery, and attempted robbery. Green stated that these charges arose from crimes that occurred approximately a month after the shooting and robbery at issue in this case. One incident occurred in Tallahatchie County on September 7, 2012, and another incident occurred in Leflore County on September 11, 2012. Green testified that Brown was

24

also involved in these crimes and that Brown had served time for convictions stemming from these crimes.

¶67. During Green's testimony, the State asked Green if he had any knowledge of Brown's other bad acts. Green answered that he did have knowledge of other crimes Brown had committed, and Green explained that he had knowledge of these crimes because he, too, had been involved. The State asked Green about the crime that occurred on September 7, 2012. Green testified that Brown provided him with "the information and the spot." The State then asked, "And that's the same plan that you guys had when you were here in Sunflower County?" (referring to the shooting and robbery at issue). Green answered, "Yes."

¶68. The State also asked Green about the crime that occurred a few days later on September 11, 2012. Green stated that in that incident, Brown provided the "[i]nformation, transportation, and weapon and mask." Green clarified that Brown informed Green of a store that had illegal slot machines in the back of the store. Brown drove Green to the store, dropped him off, and Green robbed the store.

¶69. At the conclusion of Green's testimony, the trial court gave the jury the following limiting instruction:

> Members of the jury, the Court allowed evidence of other robberies allegedly committed by Defendants Green and Brown to be admitted into evidence in this case. You may consider this evidence only as to Defendants Green and Brown for the limited purpose of intent, plan, preparation, motive, and opportunity. You may not infer that they acted in conformity with the prior acts or that they are, therefore, guilty of the charge for which they are presently on trial. You cannot, and must not, consider the evidence against the defendants who did not participate in these other robberies.

¶70. Upon review, we find that the trial court properly applied Rule 403 to the evidence

of Brown's other robberies. The trial court found that the probative value of Green's testimony regarding the other robberies was not substantially outweighed by the danger of unfair prejudice. *See* MRE 403. The trial judge also instructed the jury that the evidence regarding the other robberies was admitted for the limited purpose of showing intent, plan, preparation, motive, and opportunity. *See Taylor v. State*, 362 So. 3d 1117, 1121 (¶12) (Miss. Ct. App. 2019). Accordingly, we find no abuse of discretion.

### IV. Admission of Eloby's Redacted Confession into Evidence

¶71. Next, Brown argues that the trial court erred in admitting Eloby's redacted confession into evidence. Brown claims that Eloby's confession implicated Brown in the shooting. Because Eloby did not testify at trial, Brown asserts that admitting Eloby's confession into evidence violated Brown's right to confront witnesses against him, as guaranteed under the Sixth Amendment to the United States Constitution and Article 3, Section 26, of the Mississippi Constitution.

¶72. We review a ruling on an objection under the Confrontation Clause de novo. *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008). Both the United States Constitution and the Mississippi Constitution guarantee a defendant in a criminal prosecution the right to confront the witnesses against him. U.S. Const. amend. VI (applicable to the states through U.S. Const. amend. XIV); Miss. Const. art. 3, § 26. This right is violated when the State introduces testimonial evidence from a witness who does not testify at trial and whom the defendant had no prior opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

26

¶73. However, this Court has recognized that the Confrontation Clause "is not violated by the admission of a nontestifying co-defendant's confession at a joint criminal trial, even though the defendant is linked to the confession by other evidence properly admitted against the defendant" at trial "when the co-defendant's confession is redacted" to remove not only the defendant's name, but any reference to him, and when "the jury is given a proper limiting instruction not to use the co-defendant's confession against the defendant." *Anderson v. State*, 5 So. 3d 1088, 1094 (¶7) (Miss. Ct. App. 2007) (quoting *Gray v. Maryland*, 523 U.S. 185, 191 (1998)); *see also Strahan v. State*, 729 So. 2d 800, 804 (¶14) (Miss. 1998) ("It was clearly not a violation of Strahan's confrontation rights for the trial court to conduct a joint trial and admit the co-defendants' redacted statements. The record reflects that all references to Strahan were deleted from those statements." (citations omitted)). In the recent case *Samia v. United States*, 599 U.S. 635 (2023), the United States Supreme Court further clarified that the admission of a nontestifying co-defendant's confession does not violate the Confrontation Clause "where (1) the confession has been modified to avoid directly identifying the nonconfessing codefendant and (2) the court offers a limiting instruction that jurors may consider the confession only with respect to the confessing codefendant." *Id*. at 640.

¶74. At a pretrial hearing, Brown's counsel filed a motion in limine seeking to exclude any mention of Eloby's confession. Brown's counsel argued that admitting the confession into evidence violates the Confrontation Clause, stating:

> If Eloby does not take the stand, even if [the State] blacks out or does not mention the names of the codefendants, . . . there's no opportunity to

cross-examine him on the statement and the facts surrounding the statement or why he even gave it if he's not taking the stand, and it would be more prejudicial than probative to allow that.

However, Brown's counsel agreed that Brown's rights would not be violated if the State redacted Eloby's statement to exclude any mention of Brown.

¶75. After reviewing Eloby's confession, Brown's counsel realized that Eloby never mentioned Brown at all. Counsel then moved to withdraw the motion in limine as to Brown, and the following exchange occurred:

[Brown's counsel]: After looking back over Mr. Eloby's written statement, he does not implicate my client, he only implicates Jabrandon Green. So I will withdraw this motion.

THE COURT: You're going to withdraw the motion?

[Brown's counsel]: Yes, ma'am.

. . . .

THE COURT: Let me get this straight. Motion in Limine 4 filed by Mr. Brown is withdrawn as to Mr. Brown.

[Brown's counsel]: Yes, ma'am.

Our review of the record confirms that in his written statement to police officers, Eloby implicated himself and claimed that he acted with Jones and Green.

¶76. During Chief Deputy Flowers's direct testimony, the trial court held a bench hearing about the written confession and ultimately approved the redacted language. The redacted confession removed any reference to Jones and only mentioned Eloby and Green. The trial court acknowledged the Defendants' objection to admission of the written confession, but the court explained that it could not allow the Defendants, who chose to be tried jointly rather

28

than have their trials severed, "to hamstring the State from evidence that they should be able to get in . . . [just] because [the confession] applies to more than one defendant." The Defendants agreed to the redaction that was made but maintained their Confrontation Clause objection.

¶77. At trial, Chief Deputy Flowers testified about his investigation of the shooting and how he developed suspects. Chief Deputy Flowers explained that he received a tip from another law enforcement officer advising him to speak to a man named Davontay Brown. Chief Deputy Flowers testified that after speaking with Davontay Brown, he looked up the Facebook pages of Green, Eloby, Brown, and Jones. After examining the Facebook pages, Chief Deputy Flowers interviewed Eloby in connection with the shooting. Eloby waived his *Miranda*[5] rights and provided an oral and written statement.

¶78. During Chief Deputy Flowers's testimony, the State entered Eloby's redacted written confession into evidence. Chief Deputy Flowers also testified about the details Eloby provided in his oral statements, namely, that Eloby told Chief Deputy Flowers that he went with Green and "two more individuals" to Harris and Williams's house in Drew, Mississippi. Eloby's counsel objected to Chief Deputy Flowers's language regarding "two more individuals." During a bench conference, Brown's counsel argued that Chief Deputy Flowers had already testified that he looked at the Facebook pages of Brown and Jones, and "[t]here is no way the jury can look past the implication" that Chief Deputy Flowers is referring to Jones and Brown as the two other individuals Eloby referred to in his oral

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

29

statement. However, the trial court pointed out that counsel for the Defendants never made a contemporaneous objection to Chief Deputy Flowers's testimony about the Facebook pages he visited. Brown's counsel then objected, and the trial court overruled her objection.

¶79. After Chief Deputy Flowers testified, the trial court gave the jury the following limiting instruction: "Members of the jury, the Court allowed the statement of . . . Eloby to be admitted into evidence in this case. You may consider that statement as evidence only against the defendant Eloby. It should not be considered as evidence against defendants [Jones] or [Brown]."

¶80. The State argues that because Eloby's redacted statement did not incriminate Brown and because it was accompanied by a proper limiting instruction, its admission did not violate the Confrontation Clause. We agree. The Confrontation Clause applies to "'witnesses' against the accused." *Crawford*, 541 U.S. at 51 (quoting U.S. Const. amend. VI). Because Eloby did not name Brown at all in his written confession, Eloby was not Brown's "accuser" for purposes of the Confrontation Clause.

¶81. Regarding Chief Deputy Flowers's testimony that he visited Brown and Jones's Facebook pages as part of his investigation into the shooting and his testimony that Eloby stated that he went to Harris and Williams's house with "two more individuals," the transcript confirms that Brown failed to object to Chief Deputy Flowers's testimony regarding the Facebook pages. The transcript also reflects that Brown cross-examined Chief Deputy Flowers and had the opportunity to ask him about Eloby's statement, but Brown failed to do so.

¶82. Because Eloby's redacted statement did not incriminate Brown and because it was accompanied by a proper limiting instruction, we find that the trial court's admission of Eloby's statement did not violate the Confrontation Clause under the federal or state constitutions.

### V. Weight of the Evidence

¶83. Finally, Brown argues that he is entitled to a new trial because the jury's verdict is against the overwhelming weight of the evidence. For challenges to the weight of the evidence, this Court "view[s] the evidence in the light most favorable to the verdict and [will] disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id*. In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id*. at 292 (¶21).

¶84. In light of all the evidence discussed above, we cannot say that the jury's verdict was contrary to the overwhelming weight of the evidence. Green testified that he, Brown, Jones, and Eloby drove to Harris and Williams's residence with the intention of robbing the house. Green testified that Brown drove everyone in his silver Pontiac car. Brown drove past the house to make sure the coast was clear, and then he parked his car on a gravel road, out of sight. Green testified that he, Eloby, and Jones carried guns and wore ski masks. Banks and Harris testified that the men who robbed the house and shot Williams were wearing masks.

The trial court admitted evidence of Brown's other crimes under Rule 404(b) to demonstrate a common plan, intent, and motive relevant to the charged offense. Green testified that he and Brown committed other robberies shortly after the robbery and shooting at issue. Green's testimony reflected that these subsequent robberies had the same plan, intent, and motive as the robbery and shooting at issue, namely, that Brown provided Green and the other participants with the information, transportation, weapons, and masks for the robberies.

¶85. Our caselaw is clear that the jury was entitled to assess the credibility of the witnesses, including Green, and resolve the conflicts in the evidence. *Id*. at 289 (¶1). Accordingly, because the jury's verdict was not against the overwhelming weight of the evidence, we find that the trial court did not abuse its discretion by denying Brown's motion for a new trial.

## CONCLUSION

¶86. After our review, we find no violation of Brown's due process rights; therefore, the trial court properly denied Brown's motions for mistrial and dismissal regarding these claims. As to the admission of testimony regarding the Taurus 9mm firearm or evidence of Brown's other crimes, we find no abuse of discretion. We also find that the admission of Eloby's redacted confession did not violate the Confrontation Clause. Finally, we find that the jury's verdict was not contrary to the overwhelming weight of the evidence. Accordingly, we affirm Brown's convictions and sentences.

¶87. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**

32